## JACKSON MATERIALS CO. v. GRAND RIVER DAM AUTHORITY.

No. 31420. Sept. 18, 1945.

Rehearing Denied July 9, 1946.

*170 P. 2d 552.*

H. L. Smith, of Tulsa, for plaintiff in error.

R. L. Davidson and Edward P. Marshall, both of Tulsa, for defendant in error.

RILEY, J. This is an action by Jackson Materials Company, a corporation, against the Grand River Dam Authority to recover for certain alleged extra work done as subcontractor in the construction of the Grand River Dam and power house. Massman Construction Company, of Kansas City, herein referred to as Massman, was the principal contractor. The principal contract

provided that the contractor would perform all work and furnish all supplies, with certain exceptions, to construct the dam and power house in accordance with the plans and specifications, under the direction of the engineers employed by the Authority. Massman was to be paid a gross sum for certain items, and as to others, according to the quantity of work and materials. A vast amount of concrete of different grades was estimated as necessary. Sand and crushed rock (aggregate) were to be furnished by Massman at its own cost but a stipulated rate of pay for concrete placed in the project was provided. The specifications estimated that approximately 500,000 tons of crushed rock or aggregate and approximately 350,000 tons of sand would be required. The contract provided that the contractor should not sublet any part of the work without the written consent of the Authority and that "all clauses and requirements, terms and conditions of this contract and of the plans and specifications shall be made a part of all subcontracts for any part of the work on this project."

Massman, by written agreement, sublet to L. B. Jackson, Harley T. Price, and Howard Frye, partners, quarrying, crushing, and delivering, f.o.b. cars at the site of the quarry designated by the Authority, the rock necessary for the aggregate.

By separate written contract, Massman sublet the work of furnishing, f. o.b. cars at a site on the Arkansas river near Wybark, Okla., and within the then established freight rate zone, the sand necessary for the construction of said project. It was agreed that the subcontractors might incorporate, thus a corporation designated as Jackson Materials Company became the subcontractor. The subcontract for the crushed rock provided that the subcontractor should build, at the quarry site designated by the Authority, suitable quarry and rock crushing plant capable of producing and supplying 1,500 tons of crushed rock per day and to continue to operate the plant so as to maintain at all times during the continuance of the work, 500 tons of crushed rock at the crusher, ready for shipment to Massman, and 10,000 tons of suitable crushed rock in stock pile at Massman's concrete mixing plant at the dam. The subcontract also provided that the subcontractor would remove all "over-burden" at the rock quarry in accordance with the principal contract between Massman and the Authority. The price to be paid plaintiff under the subcontract was 70c per ton for crushed rock, and 25c per cubic yard for removing over-burden at the rock quarry. The contract price for sand was 30c per ton f.o.b. cars at the sand plant. The crushed rock and sand were to be produced, loaded, and shipped so as to comply with all the provisions of the principal contract between Massman and Authority.

After the completion of the project, plaintiff commenced this action against the Authority to recover for alleged extra work. In the first cause of action plaintiff claims that between June 23 and July 24, 1939, the Authority demanded that it be furnished with stone in quantities not specified in the subcontract and in an amount beyond the capacity of the quarry designated by the Authority; that the Authority ordered that plaintiff obtain additional stone from a quarry known as the Anderson Quarry located some distance from its quarry and crusher; that the order was made by one of the Authority's engineers, within the scope of the employment; that pursuant to said order, plaintiff delivered the stone so demanded and in doing so, expended the sum of $12,502.72 for freight from the Anderson Quarry to plaintiff's plant, and that plaintiff demanded reimbursement in the amount so expended, which the Authority refused to pay. Prayer was for judgment for said sum.

The second cause of action is for "super-stripping," that is, removal of sandstone as a part of the over-burden at the rock quarry. Plaintiff alleged that notwithstanding the contract did not require such super-stripping, the Au-

thority ordered and directed plaintiff to remove super-stripping; that pursuant to said order, plaintiff removed 6,906.2 cubic yards of super-stripping which plaintiff asserted was to be paid for at the rate of $1.75 per cubic yard, and for this alleged extra work plaintiff prayed judgment for $12,085.85.

In the third cause of action, plaintiff claimed that the Authority designated the place where the quarry was to be located for the rock to be furnished and that the site so located was unsuitable for such operations, all of which was known to the Authority and its employees, and that in the operation of said quarry, mud seams were encountered so that it became necessary for plaintiff to remove 16,849.8 tons of mud from the seams in the quarry; that it was reasonably worth $5 per ton to remove said mud, including hindrance and delay in the prosecution of the work; that by the use of ordinary care, the Authority could have determined that said quarry site contained mud seams which would necessarily require removal of the mud and hinder and delay plaintiff in the prosecution of its work; that plaintiff has demanded compensation therefor in the sum of $84,249, and that plaintiff is entitled to recover said sum because of the carelessness and negligence of the Authority in selecting a site wholly unsuitable for the purpose of the rock quarry.

In its fourth cause of action, plaintiff claims that the rock was quarried down to a layer of flint used as the floor of the quarry; that the Authority's engineer insisted that plaintiff should remove the flint; that the limestone below the flint was the rock demanded by the Authority; that plaintiff drilled and blasted through said layer of flint as ordered by the Authority's engineer and found that the rock lying beneath same was unsatisfactory; that in carrying out said order, plaintiff expended the sum of $1,500, for which plaintiff prayed judgment.

The fifth cause of action is based upon the subcontract for furnishing sand.

Plaintiff alleged that the Authority selected and designated the site from which plaintiff was to take the sand; that plaintiff proceeded to equip the site with necessary machinery for the production of the sand and proceeded to produce sand in accordance with the terms of the contract; that the Authority changed the specifications for the sand and required that a certain amount of fine sand be mixed with the sand to be furnished; that in order to meet the change of specifications, it became necessary for plaintiff to go some distance from its plant to obtain the fine sand and to construct certain buildings for use of machinery, at a cost of $632.47, and to expend $4,708.66 for gasoline and oil for the machinery used, and $26,012.75 for additional employees, $2,879.41 for public liability and workmen's compensation insurance; that plaintiff was required to expend $405 as rental in acquiring leases on land containing the necessary fine sand, and to purchase about $10,318 worth of additional machinery and equipment and to pay $1,029.52 to the property owner as royalty for the fine sand, and that for supervision of the work and all the items above mentioned, plaintiff was entitled to the sum of $63,316.17, for which it prayed judgment.

The total amount sued for in the five causes of action was $173,653.74.

The Authority answered as to each cause of action denying that there was any contractual relation between plaintiff and the Authority, pleaded its principal contract with Massman and particularly that part which provided:

"All clauses and requirements, terms and conditions of said contract of July 8, 1938, between the Grand River Dam Authority and the Massman Construction Company, the three addenda thereto, and of the plans and specifications therein referred to or made a part thereof shall be and are hereby made a part of this contract insofar as the work provided for under this contract is concerned. . ."

The answer generally and specifically denied the allegations of plaintiff's

petition as to the facts alleged charging the Authority with liability.

The issues joined were tried to a jury. At the close of plaintiff's evidence, the Authority moved the court to strike all the testimony of the various witnesses with respect to statements made by the Authority's engineers in regard to super-stripping, to the removal of the mud, and to any change in the specifications of the contract with respect to rock or sand, and with regard to the payment of extra cost or extra work, on the ground that such statements were at variance with the terms of the contract under which the rock and sand were furnished by plaintiff to Massman. The Authority also demurred to plaintiff's evidence as to each cause of action and as to the evidence as a whole. The court sustained the motion to strike the evidence, sustained the demurrer to plaintiff's evidence, discharged the jury, and dismissed plaintiff's case, and plaintiff appeals.

Plaintiff presents two assignments of error: (1) that the court erred in sustaining the Authority's demurrer to plaintiff's evidence and in dismissing the case at plaintiff's cost; (2) that the court erred in rendering judgment in favor of the Authority. There is no assignment of error going to the question of the court striking certain of plaintiff's evidence.

The two assignments of error present but one question. Plaintiff in its brief does not point out any evidence which it contends supports the first cause of action except that part thereof which shows the amount of freight paid on rock shipped from the Anderson Quarry. We find no evidence in the record tending to prove that the Authority demanded that it be furnished with stone in an amount beyond the capacity of the quarry designated by the Authority, nor do we find any evidence tending to prove that the Authority directed that plaintiff furnish additional stone in quantities not specified in the subcontract. We find no evidence that the Authority ordered or directed that plaintiff obtain additional stone from the Anderson Quarry. There was some evidence to the effect that plaintiff did obtain some stone from the Anderson Quarry, but insofar as the evidence tends to prove anything with reference to why the stone was obtained from the Anderson Quarry, it tends to show that Massman complained that plaintiff was not furnishing crushed rock in sufficient quantities as provided in its contract and threatened to take over the plant under the terms of the subcontract, and did, in fact, serve notice on plaintiff of its intention to do so; there was some litigation between plaintiff and Massman growing out of that threat, and plaintiff, on its own motion, contracted with the operator of the Anderson Quarry for additional stone and thereby avoided Massman's threat to take over the plant.

Certainly there is no evidence that the Authority ever agreed to any part of the additional expense or freight charges in connection with the stone obtained from the Anderson Quarry. There was no error in sustaining the demurrer to plaintiff's evidence as to the first cause of action.

As to the second cause of action, the plain terms of plaintiff's contract, including the provisions of the principal contract between the Authority and Massman, required the removal of all material above the strata of usable rock in the quarry designated by the Authority as of but one class. Plaintiff's subcontract provided that plaintiff should remove all over-burden in accordance with the contract between Massman and the Authority, for which Massman was to pay plaintiff at the rate of 25c per cubic yard, the quantities thereof allowed Massman by the Authority to be the conclusive basis of settlement. Article VI of the contract between Massman and the Authority provides:

"All clauses and requirements, terms, and conditions of this contract and of the plans and specifications shall be made a part of all sub-contracts for any part of the work on this project."

Addendum No. 3 of the specifications for the principal contract provided:

"The Authority will furnish the quarry without cost to the Contractor if the same is within the reservoir area, and also any quarry outside the reservoir area designated by the Authority, other than such as is furnished by the Contractor at his own expense as hereinbefore provided."

Item 2 of the specifications relating to excavation provides:

"Under this item the Contractor is to excavate all of the material overlying the bed of rock in the valley of the Grand River for the entire multiple-arch dam structure east of the east bank of the river and for the main spillway structure, and also all of the excavation which is ordered made for the spillway channel below the main spillway. This material will not be classified."

And further:

"There will be no classification of material under this item. All of the material excavated within the pay lines will be classified and paid for at the unit price bid for Item 2, and this price shall include all of the cost of excavating the material, hauling it a distance not to exceed 700 feet, and disposing of it by rough grading, except that material which is used as aggregate or as gravel backfill."

There was some evidence that the commonly-accepted meaning in the section of the country (northeastern Oklahoma) of the term "over-burden" is the soft material such as soil or clay which lies on the top of the rock; that there is a separate classification which applies to "watered stone" or unsuitable stone for aggregate or hard stone that is not suitable limestone to be used in aggregate to make concrete. There was also evidence that there was a record made of the number of cubic yards of sand rock which plaintiff removed from above the limestone in the quarry and that C. E. Klaus and William Jackson, for plaintiff, discussed with a Mr. Fuller, one of the Authority's engineers, the matter of extra compensation for the removal of such material, and that Mr. Fuller agreed to take the matter up with the Authority, and that he, Fuller, thought that plaintiff should have what Massman got for moving similar material, that is, $1.75 per cubic yard. This was in the face of the plain provision of the contract that the material to be removed would not be classified and would be paid for at the unit price bid for Item 2 under the clause relating to excavation.

In Smith v. Ferguson, 96 Okla. 150, 221 P. 447, it is held:

"While words technical or peculiar to trades, occupations, or businesses, and therefore their meaning not generally known, may be explained by parol when necessary to give proper meaning to a contract in writing, this rule does not extend to such an explanation thereof as would amount to a construction of the contract different from that evidently intended by the parties."

In Bower-Venus Grain Co. v. Norman Milling & Grain Co., 86 Okla. 152, 207 P. 297, it is held:

"Evidence of custom and usage is not admissible to vary, add to, or contradict the terms of a plain and definite contract or impose a duty or obligation upon a party to a contract not incorporated therein where such duty or obligation is expressly or impliedly excluded by the terms of the contract."

Moreover, it appears that the word "over-burden," when used in connection with rock quarries, has a well-recognized meaning defined in Webster's Unabridged Dictionary as "waste overlying a deposit of quarry stone." Evidently the plain, ordinary meaning of the word was intended; from the plain wording of the contract this waste was not to be classified.

Article XV, page 9, of the contract between Massman and the Authority, which became a part of the subcontract between plaintiff and Massman, provides:

"The performance of this contract and the work hereunder is at the risk

of the Contractor until the final acceptance thereof and payment therefor. He shall take all responsibility for the work and shall bear all losses resulting to him on account of the amount or character of the work, or because the nature of the land in or on which the work is done is different from what is assumed or expected, or on account of the weather, floods, fire, windstorms, or other action of the elements, or any cause or causes whatsoever for which the Authority is not responsible."

There was no proof of any kind tending to show that the board of directors of the Authority ever authorized its engineer, Fuller, or any other engineer, to agree with plaintiff for a classification of the over-burden or to contract or agree with plaintiff that it would be paid extra compensation for that part of the waste which happened to be sandstone instead of earth or clay. There was no evidence of any agreement to pay or that this extra cost was ever presented to or authorized by the board of directors of the Authority. Any alleged promise, agreement, or arrangement on the part of Fuller, or any other engineer, purporting to act for the Authority, involving an obligation sought to be imposed upon the Authority in excess of $10,000, unless authorized or ratified by the affirmative vote of three directors, would be void under the provisions of that part of 82 O. S. 1941 § 863 relating to contracts entered into by the Grand River Dam Authority, which reads:

" . . . no contracts which involve an amount greater than Ten Thousand ($10,000.00) Dollars, . . . shall be valid unless authorized or ratified by the affirmative vote of three (3) directors."

Perry Water, Light & Ice Co. v. City of Perry, 29 Okla. 593, 120 P. 582; United States Rubber Co. v. City of Tulsa, 103 Okla. 163, 229 P. 771; Jackson v. Board of Com'rs of Muskogee County, 133 Okla. 263, 271 P. 1041.

There was no error in sustaining the demurrer as to the second cause of action.

What we have said as to the second cause of action is applicable to the third cause insofar as any purported agreement, contract, or proviso to pay extra for removal of mud from seams found in the lime formation at the quarry is concerned. There was no evidence whatever tending to prove that the Authority, or its employees, knew that the site selected by the Authority was unsuitable for the operation of a quarry or that by the use of ordinary care they would have known of existence of mud seams in the strata of limestone. All the information which the Authority or its engineers had with reference to subsurface condition at the site selected for the quarry was available to plaintiff had it inquired. Plaintiff made its own examination of the site and apparently relied upon two test shafts which the Authority had sunk before definitely locating the quarry. In addition, the evidence shows that a number of test holes were drilled on the proposed site. There was no evidence of any misrepresentation on the part of the Authority or its engineers as to any subsurface condition. So far as the record shows, neither party knew of the existence of the mud seams at the time the contracts were executed or at the time the site for the quarry was selected. The evidence shows no more than that the mud seams encountered and the necessary removal of the mud therefrom were an unforeseen obstruction or difficulty encountered in the prosecution of the work.

Article XXIII, page 12, of the contract provides:

"The Authority will pay and the Contractor shall receive, in full compensation for furnishing supplies and materials and all labor required in the aforesaid, or from the action of the elements arising out of the nature of the work aforesaid, or from the action of the elements or from any unforeseen obstruction or difficulties which may be encountered in the prosecution of the same, . . . and for well and faithfully completing the same and the whole thereof, in the manner of and according to the speci-

fications and any and all plans and drawings thereof, and the requirements of the Engineers under them, . . ." a specified price.

In City of Dallas v. Shortall, 131 Tex. 368, 114 S.W. 2d 536, it is held:

"To justify recovery against city for extra expense incurred in performance of contract because of city's misrepresentation of conditions under which contract was to be performed, some element of deception which in contemplation of law is fraudulent or amounts to bad faith must be proved."

And:

"A person who agrees to do for a fixed sum a thing possible to be performed will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered."

That part of article XV, page 9, of the contract, quoted above, applies with equal force to plaintiff's claim under the third cause of action. There was no error in sustaining the demurrer to the evidence as to the third cause of action.

As to the fourth cause of action, there was no evidence whatever tending to prove that when the limestone in the quarry was quarried down to the layer of flint which was used as the floor of the quarry, the engineer for the Authority insisted that plaintiff drill through the flint and that the limestone below the flint was the rock the Authority demanded. The only evidence on that question was the testimony of the witness C. E. Klaus, who was superintendent of the quarry and crushing plant from January 12, 1939, to June 29, 1939, which was:

"Q. When you got down to that point did you have any conversation with this Mr. Fuller, or any other engineer of the engineering staff of the Grand River Dam Authority, about dealing with that flint? A. Yes, with Mr. Fuller. Q. What was said by him to you about that? Mr. Marshall: Object to it as incompetent, and irrelevant, and not binding on this defendant. The Court: Overruled at this time. Mr. Marshall: Exception. A. Mr. Fuller stated to try a shot, and that he didn't think that the flint was of any great quantity, that it would mix up with the regular stone, and would pass for stone at the dam. I blasted, I think, fifteen or eighteen holes—to my recollection. . . Q. What did you do and ascertain or find then, with reference to the material that became broken up as a result of that shot? A. It was entirely too much flint. Q. And what was told you by Mr. Fuller? A. Not to send it to the crusher. Of course, in the meantime, the result of this shot spread pretty well around the quarry. Q. Do I understand by that that some of these flint rocks became mixed with some of the other rocks which were limestone? A. That's right. Q. As a result of that operation that you have last described, then did you find in the base of a quarry, if it was four feet thick, or it was three feet thick, any commercial limestone? A. Commercial limestone, I am only speaking of Mr. Fuller's talk with me, the talk about the flint. . . Q. Have you an independent recollection as a matter of memory with respect to accuracy about what it did cost to make this experiment there in the base of the quarry that Mr. Fuller told you to make? . . . A. Yes, sir, it was a little over $1,500. I have a very good recollection of it— a little over."

There was no suggestion or claim at the time that the drilling and blasting the layer of flint was beyond or not within the contract obligation or that said work was "extra work" for which plaintiff could and would claim compensation. There was no showing of any attempt to comply with the plain provisions of the principal contract as to the procedure necessary to establish a proper claim for compensation for extra work.

Article XVIII of the principal contract provides for work which could not be classified under any item of the contract, as follows:

"The Contractor shall do any work or furnish any materials which cannot reasonably be classified under any of the items of the contract but which may be found necessary in order to carry out and complete more fully the work herein agreed to be done and performed,

when and as ordered in writing by the Engineer; and the Contractor hereby agrees to accept, as full compensation for such extra work, unit prices agreed upon in writing before said work is commenced."

Said article then provides that whenever, in the judgment of the engineer, it is impractical, because of the nature of the work or for any other reason, to agree upon unit prices, the extra work or materials shall be paid for at actual necessary cost as determined by the engineer, plus 10%, which includes all costs of general superintendence, general expense, and profit. In such case, the contractor was required, on or before the 10th day of the month succeeding that in which the extra work shall have been done, to file with the engineer an account giving the itemized cost of such extra work. By failure to file such account within the time specified, the contractor is deemed to have performed such extra work without charge and to be entitled to no compensation therefor.

The second paragraph of article XIX, page 11, of the contract, provides:

"If the Contractor considers any work demanded of him to be outside the requirements of the contract, or considers any record or ruling of the Engineers to be unfair, he shall, immediately upon such work being demanded or such record or ruling being made, ask for written instructions or decision, whereupon he shall proceed without delay to perform the work or to conform to the record or ruling and, within ten (10) days after the date of receipt of the written instructions or decision, he shall file a written protest with the Engineers, stating clearly and in detail the basis of his objections. Except for such protests or objections as are made of record in the manner herein specified and within the time limit stated, the records, rulings, instructions or decisions of the Engineers shall be final and conclusive. Instructions and decisions of the Engineers contained in letters transmitting drawings to the Contractor shall be considered as written instructions or decisions subject to protest or objections as herein provided."

There was no showing whatever that any of this alleged extra work was ordered in writing by the engineers or that the price thereof was agreed upon in writing before said work was commenced. Likewise, there is no showing that plaintiff had filed its itemized account within the time required by the contract, or at all, and there was no showing whatever of compliance with paragraph 2, article XIX, of the contract quoted above.

Compliance with contract provisions is essential to the recovery by a contractor for alleged extra work. Woodruff v. Rochester P. R. Co., 108 N.Y. 39, 14 N. E. 832; Burns v. Thorndike, 228 Mass. 552, 117 N. E. 799; Ashley v. Henahan, 56 Ohio St. 559, 47 N. E. 573; City of Lawton v. Sherman Mach. & Iron Works, 182 Okla. 254, 77 P. 2d 567.

Plaintiff relies upon a number of cases holding that the owner may, by oral agreement or otherwise, modify a construction contract and become liable to pay a subcontractor for work required by change in the specifications, and that the agreements of engineers or architects may be ratified requiring similar payments. That rule applies generally to individual owners. It likewise applies to municipal corporations, but as indicated in the authorities above quoted and particularly in City of Lawton v. Sherman Mach. & Iron Works contracts may be made and executed by municipal corporations only by the officers and in the manner provided by law, and that ratification of acts of the agents of municipal corporations must be by the officers and in the manner provided by law. There was no error in sustaining the demurrer to plaintiff's evidence as to the fourth cause of action.

The fifth cause of action is based upon the separate subcontract with Massman to furnish sand for the construction of the dam and power house, estimated at 350,000 tons. Plaintiff's claim is that the Authority selected and designated the site from which plaintiff was to take the sand; that plaintiff erected its plant and proceeded to produce sand

in accordance with the contract; that thereafter the Authority changed the specifications for sand and required plaintiff to add more fine sand to the mixture, to the additional expense of plaintiff in the sum of $63,316.17.

The evidence wholly fails to prove that the Authority selected or designated the site for the production of the sand. On the contrary, plaintiff's evidence conclusively shows that plaintiff itself selected the site and that the Authority merely approved the selection as provided in the contract. Plaintiff did not plead an agreement on the part of the Authority to pay any part of the additional expense. The evidence was that Mr. Holloway, one of the Authority's engineers, and Mr. R. L. Davidson, the attorney for the Authority, promised that plaintiff would be paid for the alleged extra expense. There was no evidence whatever that the claim was presented to the board of directors and that the alleged contract, agreement, or promise was approved by the affirmative vote of three directors. There was no evidence of compliance with paragraph 2 of Article XIX, page 11, of the contract. If plaintiff considered the engineer's requirement for additional fine sand to be outside the requirement of its contract, or outside the contract between Massman and the Authority, it was its duty, immediately upon the demand of the engineer, to ask for written instructions or decision, and then, upon receipt of such written instructions or decision, without delay to perform the work required and within ten days after receipt of such written instructions or decision, file a written protest with the engineer stating clearly and in detail the basis of its objection. The contract clearly provided that except for such protest or objection, made in the manner and within the time specified, the instructions of the engineer should be final and conclusive.

The evidence does not, in fact, show that the Authority changed the specifications for the sand. The specifications required that "the sand shall be Arkansas River sand . . ." all of which will pass a 3/16 inch square or equivalent round opening. The contract provided further that the finest grade of sand retained on a No. 100 sieve would have a 90 to 98 cumulative percentage by weight.

Plaintiff's evidence tended to show that it was producing sand such that 97½% thereof would be retained on a No. 100 sieve; that the engineers advised plaintiff that such sand would be accepted; that the engineers later demanded delivery of sand which would contain not more than 95% of particles which would be retained in a No. 100 sieve; that plaintiff declined to comply with such demand and insisted that 97½% was all that was required, and that finally plaintiff compromised and agreed to, and did add 1% of fine sand. As we view the contract, this was no change of specifications. The specifications, so far as above stated, allowed a variation of 8% as to the amount of fine sand, but another clause of the specifications providing for the final test relating to the suitability of the sand is that:

"Briquettes made from the sand to be used and composed of one (1) part cement to three (3) parts of sand by weight, shall be at the ages of seven (7) and of twenty-eight (28) days at least as strong as briquettes made with standard Ottawa sand, using the same cement and the same proportions and water-cement ratios."

If, upon test made by the engineers, it developed that the sand being delivered would not make briquettes of the specified strength, because it did not contain enough of the finer particles of sand, it was the right of the engineers to call for additional fine sand up to 10% so as to make the sand meet the required test. It is plain from the contract that plaintiff was under obligation to produce and load sand, within the limits of the amount of fine sand set forth in the specifications, which would meet the required test. Any promise to pay any additional sum

to deliver sand of a grade which the plaintiff was already under obligation to deliver was without consideration even though the engineers had authority to make such promise. 17 C. J. 465-68; Watson v. American Creosote Works, 184 Okla. 13, 84 P. 2d 431. There was no error in sustaining the demurrer to plaintiff's evidence as to the fifth cause of action.

Affirmed.

GIBSON, C. J., HURST, V. C. J., and BAYLESS, WELCH, CORN, DAVISON, and ARNOLD, JJ., concur.