2003 OK 5

**PITCO PRODUCTION COMPANY,**
Plaintiff–Appellee,

v.

**CHAPARRAL ENERGY, INC., and**
Cheyenne Petroleum Company,
Defendants–Appellants.

No. 94,748.

Supreme Court of Oklahoma.

Jan. 21, 2003.

Gregory L. Mahaffey, Oklahoma City, Oklahoma, for appellants.

James W. Smith, Stigler, Oklahoma, for appellee.[1]

OPALA, V.C.J.

¶1 The dispositive issue presented on certiorari is whether the terms of a joint operating agreement that designates one party as operator of the unit area and whose language refers to the "operator" in singular form permits the election of more than one unit operator in a Corporation Commission-designated spacing and drilling unit. We answer in the negative.[2]

I.

ANATOMY OF THE LITIGATION

¶2 Chaparral and Cheyenne (appellants) and Pitco (appellee) are working interest owners in a Corporation Commission-designated drilling and spacing unit. Two wells have been drilled in the unit area.

1. Identified herein are only those counsel for the parties whose names appear on the certiorari briefs.

2. Appellants also challenged on appeal the district court's ruling that venue was properly laid in Haskell County and its denial of appellant's motion for summary judgment. COCA's opinion addressed both issues and affirmed the nisi prius decision. Neither petitioner nor respondent raised either of these issues on certiorari. An issue tendered and decided on appeal but not reasserted by petition or counter-petition for certiorari stands abandoned. See the provisions of Rule 1.180(b), Supreme Court Rules, 12 O.S. 2001, Ch. 15, App.1. *Hough v. Leonard,* 1993 OK 112, ¶¶ 15–17, 867 P.2d 438, 445–46.

3. The JOA provides for successive unit operators to be selected by "majority vote in interest." Paragraph 19, Resignation, Removal and Selection of New Operator, of the JOA provides:
"Should Operator resign from its duties and obligations as Operator or should a sale be made by Operator of over fifty percent (50%) of its rights and interests, the parties shall have the right within sixty (60) days after the date of such resignation or sale, by *majority vote in interest,* to select a successor Operator ..." (Emphasis supplied.)
The meaning of the term "majority vote in interest" need not be explored because we reverse the nisi prius decree on other grounds.

¶3 At the time the first well (Scott No. 1–23) was drilled in 1980 the working interest owners entered into a Joint Operating Agreement (JOA or contract or agreement), designating Cheyenne as the operator of the unit area. Upon completion of a second well (the Kirkwood No. 1–23) in 1981, Cheyenne assumed operator status of that well in accordance with the provisions of the JOA. In 1998 Cheyenne resigned as operator and sold its interests to Chaparral, invoking the JOA's "new operator" provisions.[3] Chaparral sought election to be named unit operator of both wells. Balloting resulted in Chaparral receiving 69.547840% vote of the working interest owners in the Scott well but only 46.129760% vote of the owners in the Kirkwood well. Pitco then offered itself for election as unit operator, and the results of this ballot revealed that it received 51.07738% vote of interests in Kirkwood well.[4]

¶4 It is important to note that the resulting vote occurred because of an existing imbalance of ownership interests in the two wells. The imbalance was the consequence of an earlier violation of the Maintenance of Unit Ownership clause[5] of the JOA. In antic-

4. The parties do not dispute the vote tallies. Chaparral's and Pitco's ballots appear to have been distributed to the working interest owners on a well-by-well basis. Those voting interests in favor of Pitco own a majority interest in the unit area *except for the majority interest in the well-bore of the Scott well.* (Samson owns no interest in the Scott well following its conveyance of this interest in 1982.) Pitco's majority is comprised of Pitco's 27.659300% cast in favor of itself and Samson's 23.41808%, for a total of 51.07738% majority vote in the Kirkwood well.

5. The pertinent text of the Maintenance of Unit Ownership clause, paragraph 20, of the JOA, states:
"For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:
(1) the entire interest of the party in all leases and equipment and production; or
(2) an equal undivided interest in all leases and equipment and production in the Unit Area." * * * (Textual alteration supplied.)

ipation of the situation in which today's parties find themselves, the JOA provides that conveyances are to be made so as to maintain the same ratio of ownership throughout the unit area. This provision was breached approximately sixteen (16) years earlier in 1982 when a working interest holder, Samson, conveyed its interest in the Scott well (and not the Kirkwood), thereby creating the imbalance in ownership interests in the two wells.

¶ 5 Pitco requested that Chaparral relinquish operation of the Kirkwood well. Chaparral refused. Pico sought a declaratory decree [6] naming it as operator of the Kirkwood well. The trial court, after hearing arguments, ruled that the contract did not preclude multiple operators who are elected by a majority vote in interest of the working interest operators.[7] It directed Chaparral to remain as operator of the Scott well and Pitco to serve as operator of the Kirkwood well. Chaparral appealed from this order. The Court of Civil Appeals [COCA], Division II, reasoned that the trial court's decree construing the contract as not precluding multiple operators was erroneous; only independent, competing operators are prohibited. Because the parties permitted the existence of a condition which led to the election of multiple operators and because the trial court reached a correct result, COCA affirmed the trial court's decree.

## II.

### ARGUMENTS ON CERTIORARI

¶ 6 Chaparral contends the JOA requires an election of one operator for the unit area.

The agreement's *language* and *content* do indeed contemplate only one unit operator. COCA's reasoning—"the parties permitted the existence of a condition which, by its nature, led to the problem of multiple operators"—is not just incorrect, it is also used by COCA as a basis to allow the breach of one contract provision (the earlier violation of the Maintenance of Unit Ownership Clause) to excuse enforcement of another (the election of a sole unit operator).[8]

¶ 7 Pitco argued before COCA simply that the language of the JOA neither precludes more than one unit operator nor an election of operators on a well-by-well basis.[9]

¶ 8 **Both sides presented this controversy as a private-law issue. We have no record support for the notion that the controversy may be affected in any way by the Corporation Commission's regulatory power over production and conservation of oil and gas.**[10]

## III.

### PERTINENT JOA PROVISIONS

¶ 9 The question before us is one of contract construction. The JOA at issue, an A.A.P.L. Form 610—Model Form Operating Agreement–1956, is a printed form which is altered by certain deletions and modifications of the parties. The term "operator" is not defined in the agreement. A document entitled "Accounting Procedure Joint Opera-

---

6. Declaratory relief is authorized by the provisions of 12 O.S.1991 §§ 1651 et seq. Section 1651 provides:

 District courts may, in cases of actual controversy, determine rights, status, or other legal relations, including but not limited to a determination of the construction or validity of any foreign judgment or decree, deed, contract, trust, or other instrument or agreement …

7. Record, pp. 115–116. For the text of the JOA concerning the vote required to elect a successor operator see *supra* note 3.

8. Because we reverse and remand upon **our** resolution of the meaning to be ascribed to those contract clauses which call for but one operator, today's decision makes it unnecessary to deal

with the appellants' other argument. The latter addresses the contract clause that requires alienation of interests to be in the entirety or be proportionately uniform in order to maintain uniformity of ownership interests. **We also note that there is no proof in this record of *any* waiver by *any* party of *any* contractual obligations.**

9. Pitco did not respond to our call for supplemental briefs.

10. The record does not inform us with respect to the impact of the Corporation Commission's regulatory power on the operation of these two wells nor of whether the Commission's power was ever invoked to affect the operation and production of these two wells.

tions," attached as an exhibit and made a part of the JOA, defines "operator" as "the party designated to conduct the Joint Operations."

¶ 10 Two JOA provisions primarily reference the status of unit operator. The first, is paragraph 5, entitled "Operator of Unit." [11] At the contract's inception it was agreed by the parties that Cheyenne would be designated operator of the unit area. Paragraph 5 provides "Cheyenne Petroleum Company shall be the Operator of the Unit Area ..." The second provision whose content primarily addresses the unit operator is one which the contracting parties modified. All of paragraph 19, "Resignation, Removal and Selection of New Operator," [12] replaced the printed form's paragraph of the same number. That paragraph deals with selection of a new operator. The modified language of this paragraph uses the term "operator" in singular form and describes selection of "*a successor operator*" in the event of resignation or removal of the existing operator.[13]

¶ 11 All other references to "operator" in the JOA and its exhibits refer to that entity in singular form, often accompanied by singular-form grammatical articles. The JOA contains no specific language which either permits or limits the number of operators in the unit area.

## IV.

### RULES FOR CONSTRUING THE JOA

 ¶ 12 The JOA is a contract to be construed like any other agreement.[14] If language of a contract is clear and free of ambiguity the court is to interpret it as a matter of law,[15] giving effect to the mutual intent of the parties at the time of contracting.[16] Whether a contract is ambiguous and hence requires extrinsic evidence to clarify the doubt is a question of law for the courts.[17]

¶ 13 The essence of Pitco's argument is that the contract's silence on limiting the number of operators supports a construction that permits multiple operators in this unit area. Pitco's landman testified that it is not uncommon industry practice for there to be more than one operator per unit area.[18] Chaparral contends the agreement's language and text permit only one operator for this unit area. Because Pitco introduced testimony of custom of industry, we must determine whether the contract between the parties is ambiguous so as to permit extrinsic evidence.

 ¶ 14 The parties disagree whether the JOA precludes multiple operators. The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous. A contract is ambig-

---

11. Paragraph 5 of the JOA entitled "Operator of Unit" provides:
"*CHEYENNE PETROLEUM COMPANY shall be the Operator of the Unit Area,* and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement." (Emphasis added.)

12. For the complete text of paragraph 19 see *supra* note 3.

13. See *supra* note 3 for the entire language of paragraph 19.

14. *Oxley v. General Atlantic Resources, Inc.,* 1997 OK 46, ¶ 13, 936 P.2d 943, 945.

15. *Lewis v. Sac and Fox Tribe of Oklahoma Housing Authority,* 1994 OK 20, ¶¶ 25–27, 896 P.2d

503, 514, cert. denied, 516 U.S. 975, 116 S.Ct. 476, 133 L.Ed.2d 405 (1995)(citing *Mercury Inv. Co. v. F.W. Woolworth Co.,* 1985 OK 38, ¶ 9, 706 P.2d 523, 529).

16. Oklahoma statutes provide a comprehensive scheme which governs contractual agreements. See 15 O.S.1991 §§ 151–178. The text of 15 O.S.1991 § 152 provides:

 A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful.
 *Mercury, supra* note 15 at ¶ 9 at 529.

17. *Lewis, supra* note 15 at ¶ 25 at 514.

18. The landman's testimony that the existence of multiple operators in a unit area is not uncommon was in response to a general question that did not specify contract terms or parties' preferences. R. p. 151.

uous if it is reasonably susceptible to at least two different constructions.[19] To decide whether a contract is ambiguous we look to the language of the entire agreement. A contract must be considered as a whole so as to give effect to all its provisions.[20] The language in a contract is to be given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept.[21] If a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended.[22] That intention cannot be divined from extrinsic evidence but must be gathered from a four-corners' examination of the instrument.[23]

## V.

### THE JOA—WHILE NEITHER EXPLICIT NOR SILENT CONCERNING THE NUMBER OF OPERATORS TO BE PERMITTED IN THE UNIT—IS NOT AMBIGUOUS

¶ 15 The dispositive factor of our analysis must be whether an examination of the entire JOA text reveals more than one operator for this unit is a reasonable interpretation of the contract's provisions. Our four-corners' examination of the contractual instrument in question reveals the *terms* and *provisions* are neither ambiguous nor susceptible to more than one interpretation.

¶ 16 We note at the outset the singular form of the term "operator" (with corresponding singular articles of grammar modifying the term) is used consistently throughout the document. The JOA is a pre-printed model-form operating agreement where the parties complete the document by filling in the blanks with necessary information. While the document shows the parties made some modifications to the contract's provisions, nowhere is the singular term "operator" altered to reflect a plural form of the expression.

¶ 17 The word "operator," while commonly used in the oil and gas industry, conveys no technical significance.[24] One requires no special knowledge to impart meaning to the term "operator" (or passages containing the term "operator"), nor is evidence of industry usage for this term necessary to enhance or otherwise clarify the term's ten-

---

**19.** *Osprey v. Kelly–Moore Paint Co.,* 1999 OK 50, ¶ 14, 984 P.2d 194, 199 (citing *Littlefield v. State Farm Fire & Casualty Co.,* 1993 OK 102, ¶ 7, 857 P.2d 65, 68). A contract is ambiguous when it is fairly susceptible to two different constructions, so that reasonably intelligent men, on reading the contract would honestly differ as to its meaning. *U.S. Fidelity & Guaranty Co. v. Guenther,* 281 U.S. 34, 37, 50 S.Ct. 165, 74 L.Ed. 683 (1930).

**20.** The terms of 15 O.S.1991 § 157 state:
The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others.
*Lewis, supra* note 15 at ¶ 27 at 514.

**21.** The text of 15 O.S.1991 § 160 provides:
The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.
*Lewis, supra* note 15 at ¶ 27 at 514.

**22.** "A contract is to be interpreted to give effect to the mutual intention of the parties at the time of contracting, and in so doing **the language used**

governs if it is clear and does not involve an absurdity. The meaning of a contract is to be ascertained from the writing alone, if possible, the duty of the court being to declare the meaning of what is written in the instrument, **not what was intended to be written.**" *Hicks v. Mid–Kansas Oil & Gas Co.,* 1938 OK 84, ¶ 0, 76 P.2d 269, 269, 182 Okl. 61. (Emphasis supplied.)
*Lewis, supra* note 15 at ¶ 27 at 514.

**23.** *Lewis, supra* note 15 at ¶ 27 at 514.

**24.** The provisions of 52 O.S.1991 § 86.1 define the term "operator." The text states:
"* * *(h) The term "operator" shall mean any producer of oil or gas who has drilled a well or wells into a common source of supply and is engaged in operating such well or wells for the purpose of producing oil or gas therefrom; * * *" (Textual alteration supplied.)
The Oil and Gas Conservation Act, 52 O.S.1991 §§ 86.1 et seq., does not affect the controversy before us because it applies to the regulatory power of the Corporation Commission, and the dispute here is a private-law matter. This general description of an "operator" neither provides nor requires specific, technical knowledge to further illuminate the meaning of the term.

or.[25] The responsibilities of the operator are delineated by various provisions throughout the agreement and are not contested by today's parties. Likewise, the term "unit area" conveys no technical information. The JOA defines unit area,[26] and its definition serves to limit those lands, oil and gas leasehold interests and oil and gas interests to be developed under the agreement. Because we hold the JOA's terms plain and unambiguous, we cannot consider Pitco's adduced proof that it is common industry practice to allow more than one operator per unit area.[27]

¶ 18 Having decided the contract is unambiguous and a clear reflection of the parties' intention, we turn next to consider whether, from a four-corners' examination of the JOA, the parties intended more than one operator in the unit area. The agreement plainly reveals the parties' intent with regard to the number of unit operators authorized for the unit area.

¶ 19 At its inception, the parties to the JOA designated *one party* (Cheyenne) to serve as unit operator.[28] The same paragraph (naming Cheyenne operator of the unit area) empowers it *"to conduct and direct and have full control of all operations on the unit area."*[29] In the event of the operator's resignation, a later paragraph of the JOA provides for the selection of *a successor operator.*[30] We note that the original preprinted form provision dealing with selection of a new operator was stricken by the parties and new, original language substituted in its place. Even with this alteration, the terminology used in the JOA refers to one operator. These provisions, at the heart of this controversy, create, invest with authority, and allow for the succession of but a single operator. Remaining contractual provisions serve to complement these paragraphs and clothe the operator with specific responsibilities [31]—duties which if undertaken by multiple operators would be ponderous, defeating the enabling terms of paragraph 8. When the JOA is read as a whole, only one construction

25. A finding of ambiguity must be made before the court can look at the custom of the industry to determine the parties' obligations. *Cook v. Oklahoma Bd. of Public Affairs*, 1987 OK 22, ¶ 15, 736 P.2d 140, 147 (citing *Jackson Materials Co. v. Grand River Dam Auth.*, 1945 OK 228, ¶¶ 20–21, 170 P.2d 552, 557, 197 Okl. 353). Evidence of custom and usage may not be used to vary, add to, or contradict the terms of a plain and definite contract, nor may it be used to impose a duty or obligation upon a party to a contract not incorporated therein, where such duty or obligation is expressly or impliedly excluded by the terms of the contract. *Bower–Venus Grain Co. v. Norman Milling & Grain Co.*, 1922 OK 162, ¶ 15, 207 P. 297, 300, 86 Okl. 152.

26. The definition of the term "unit area" as provided in paragraph 1 of the JOA states:
The term "Unit Area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under the agreement.

27. "The written instrument cannot be varied, modified or changed by parol testimony. When proof of an oral promise is essential to one's claim and the testimonial evidence proffered as to its existence, though unobjected to, is violative of the parol evidence rule, it is entirely proper for the court to rule as a matter of law that the claim is without legal support. This is so because the parol evidence rule is part of the substantive rather than adjective law." (footnotes omitted) *Snow v. Winn*, 1980 OK 27, ¶ 12, 607 P.2d 678, 682; *Warren v. Pulley*, 1943 OK 248, ¶ 12, 141 P.2d 288, 292, 193 Okl. 88; *Investors Royalty Co. v. Lewis*, 1939 OK 290, ¶ 8, 91 P.2d 764, 766, 185 Okl. 302.

28. *"CHEYENNE PETROLEUM COMPANY shall be the Operator of the Unit Area ..."* (Emphasis supplied.) For the full text of paragraph 5, Operator of Unit Area, see *supra* note 11.

29. "Cheyenne ... shall conduct and direct and have full control of all operations on the Unit Area ..." (Textual alteration supplied.) For the complete text of paragraph 5, Operator of Unit Area, see *supra* note 11.

30. "Should Operator resign ... the parties shall have the right ... to select *a successor Operator.*" (Emphasis supplied.) For the entire text of paragraph 19 see *supra* note 3.

31. Paragraph 8 of the JOA, Costs and Expenses, states:
"[O]perator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the Unit Area ... and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expense basis provided in the Accounting Procedure ..." (Textual alteration supplied.)
Paragraph 6 of the JOA, Employees, provides:
"The number of employees and their selection, ... shall be determined by the Operator." (Textual alteration supplied.)

is reasonable. One operator is to conduct and exercise complete control of all operations on the unit area, regardless of the number of wells.

¶ 20 Lastly we note that Pitco's argument—nothing in the JOA prohibits multiple operators [32]—is likened to the logical impossibility of "proving a negative." To accept Pitco's view would require that future contracts redundantly restate in the negative every positive statement previously made.[33] We decline to engage in so strained a construction of an agreement to create an ambiguity where none exists.[34]

## VI.

### SUMMARY

¶ 21 Oklahoma's extant jurisprudence and her comprehensive statutory scheme governing contractual agreements are well established. Applying the general principles of contract construction, we hold the JOA in contest clearly manifests the parties' intention to allow but one operator who has full and complete control over operations on the unit area. Our review of the agreement reveals contract terms to be unambiguous and readily understood when read in their plain and ordinary sense. The language and text of the contract, as an entirety, establishes one operator, empowers it with complete control over all operations within the unit area, and, in the event of operator's resignation, provides for selection of a successor operator. Because we conclude the JOA authorizes but one operator to conduct unit-wide operations, we need not address Pitco's argument (pressed before COCA)

that election of operators is to be made on a well-by-well basis.

¶ 22 On certiorari previously granted on Chaparral's petition, the Court of Civil Appeals' opinion and the trial court's declaratory decree are vacated; the cause is remanded for further proceedings to be consistent with today's pronouncement.

¶ 23 WATT, C.J., LAVENDER, HARGRAVE, KAUGER, AND WINCHESTER, JJ., CONCUR.

¶ 24 BOUDREAU, J., CONCURS IN RESULT.

¶ 25 HODGES AND SUMMERS, JJ., DISSENT.

---

**32.** Although not applied by the U.S. Supreme Court in *Herman & MacLean v. Huddleston,* 459 U.S. 375, 387, n. 23, 103 S.Ct. 683, 74 L.Ed.2d 548, the maxim *"expressio unius est exclusio alterius"*—the expression of one thing is the exclusion of another—is applicable in this situation. When particular persons or things are specified in a law, contract, or will, an intention to exclude all others may be inferred. *Dail v. Adams Bldg. Corp.,* 1947 OK 309, ¶ 11, 195 P.2d 755, 759, 200 Okl. 451 (Riley, J., dissenting). Other jurisdictions have applied this canon of construction to contracts as well as to statutes. See *McAllister v. Century Indemnity Co.,* 24 N.J.Super. 289, 94 A.2d 345, 347 (1953); *Teters v. Montana Eastern Pipe Line Co.,* 117 Mont. 477, 159 P.2d 515, 517 (1945); *Lawrence v. Cooper*

*Independent Theatres,* 177 Kan. 125, 276 P.2d 350, 353 (1954); *Flyge v. Flynn,* 63 Nev. 201, 166 P.2d 539, 558 (1946).

**33.** A document restating the reverse of each paragraph constitutes an absurdity. *Hicks, supra* note 22 at ¶ 0, at 269.

**34.** Neither a forced nor strained construction will be indulged, nor will any provision be taken out of context and narrowly focused upon to create and then construe an ambiguity so as to import a more favorable consideration to either party than that expressed in the contract. *Dodson v. St. Paul Ins. Co.,* 1991 OK 24, ¶ 12, 812 P.2d 372, 376–77.