O’BRIEN,
dissenting.
The district court and the majority of this court define debris more restrictively than vernacular usage suggests. Moreover, neither the contract language nor Union Pacific’s conduct (locking and painting the derails) suggests Union Pacific was responsible to keep the derails free of sand. For those reasons I respectfully dissent.
Section 5(f) of the ITA imposes upon Dolese a duty to keep “the area between the rails and within the lateral clearance area [of the spur track] free and clear of debris and/or obstructions of any kind or nature....” Section 5(g) requires Dolese to indemnify Union Pacific for expenses it incurs as a result of Dolese’s breach of § 5(f). Because the ITA does not define the term “debris,” we turn to its plain and ordinary meaning. Pitco Prod. Co. v. Chaparral Energy, Inc., 63 P.3d 541, 546 (Okla.2003) (“The language in a contract is to be given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept.”).
“Debris” is defined as:
The remains of anything broken down or destroyed; ruins, wreck: a. orig. (in *657 Eng.) fig.; b. in Geol. applied to any accumulation of loose material arising from the waste of rocks; also to drifted accumulation of vegetable or animal matter (Page); thence, c. any similar rubbish formed by destructive operations.
Oxford English Dictionary Online (2005). “Debris” is also defined as:
1. The scattered remains of something broken or destroyed; rubble or wreckage.
a. Carelessly discarded refuse; litter.
2. Geology. An accumulation of relatively large rock fragments: glacial debris.
3. Biology. The fragmented remains of dead or damaged cells or tissue.
The American Heritage® Dictionary op the English Language, (4th ed.2000).
The district court concluded the accumulation of spilled sand is not “debris” because sand is Dolese’s main product. The Majority appears to agree. I do not. The sand may be a valuable commodity to Dolese, but only when it is marketable. When it is spilled during loading or yard transport, and not reclaimed, it loses its identity as product and becomes “discarded refuse;” the “scattered remains” of marketable sand. Hence it is “debris.” That is particularly true here when the parties used broad and all-inclusive language in the phrase “debris ... of any kind or nature.” I can discern no intent to exclude Dolese’s product. Were Dolese in the refuse reclamation business, the garbage it spilled during loading or transport would be “debris” even though it would also be the main product.
Derails are hinged devices attached to one of the rails and serve two purposes. In their usual position, hinged over the rail and locked down, their purpose is to derail railroad cars on the spur line to prevent them from rolling onto the main line and colliding with trains. On the other hand, when the derails are unlocked and hinged to the open position they allow railroad cars to pass from the spur to the main line, presumably under controlled conditions. Dolese’s contractual obligation “to keep the area between the rails ... free and clear of ... obstructions of any kind” [1] includes not only obstruction to the rails, but also the derail.[2] Were sand to accumulate on or about the derail in sufficient quantity to obscure it or impair its function, the passage of cars to and from the spur would be obstructed. The contract must be construed in light of its obvious purpose — the safe and efficient movement of railroad cars to and from the spur. Because Dolese agreed to keep the spur track free of obstructions and debris, it breached that duty by allowing sand to accumulate in and around the derail.
Because of the posture of this case I attach no significance to the fact that the derails were padlocked and only Union Pacific employees could operate them (or *658 that Union Pacific painted them). The issue presented was not whether sand was adequately removed, but which party was contractually obligated to see to its removal. Sykes, the injured Union Pacific employee, testified in his deposition:
I had to dig the switch out. I mean, dig the lock out. And, also, I had to dig a hole deep enough to allow the derail to fit in once it come off the rail. It’s got to be track level, or else you’re going to hit it with your engine.
Dolese could remove the sand from around the derails without opening them.[3] While it may not foreclose other issues, Dolese agreed to keep the spur track (which contained the derails) free from debris and/or obstructions of any kind or nature. That duty is not dependent upon who might be authorized to open the derails.
I would reverse the summary judgment entered by the district court.

. There is no question that the derail is "within the lateral clearance area [of the spur track]."

. Dolese argues the derails are located at the point where the spur track and main line meet and therefore are not within the area of its responsibility, i.e., the spur track. The diagram attached to the ITA provides support for this argument. However, the affidavit of Billy Johnson, a Union Pacific Manager of Track Maintenance for twenty-eight years, states the derails at issue were located on the spur track, seventy feet from the point where the spur track and main line meet. Pictures of the derails taken by Gary Gott, a Union Pacific Senior Claims Representative, support Johnson’s affidavit. Moreover, that the derails are located seventy feet from where the main and spur tacks meet is logical, as it makes little sense to derail a train at the point where the tracks meet.

. If a party contracted to keep a yard free of weeds but failed to do so in the area around a shed, that party could not credibly argue that its contractual obligation was negated because the shed was locked.