2004 OK CIV APP 81

Robert L. STEPHENSON, Norma Stephenson Living Trust, Sandra J. Bass, Tim Stephenson, Omer Stephenson, Bill Owen, James Warmker, Barbara Coffman, S.T. Ayers, James Flow, Irene Price Warmker Family Trust, and L & I Exploration Corp., Plaintiffs/Appellees/Counter–Appellants,

v.

ONEOK RESOURCES COMPANY, Defendant/Appellant/Counter–Appellee.

No. 99,383.

Court of Civil Appeals of Oklahoma, Division No. 3.

May 21, 2004.

Certiorari Denied Oct. 4, 2004.

---

⟳194.40

---

Robert H. Gilliland, Jr., Beauchamp M. Patterson, McAfee & Taft, Oklahoma City, OK, For Plaintiffs/Appellees.

Fred R. Gipson, Oklahoma City, OK, For Defendant/Appellant.

Opinion by CAROL M. HANSEN, Judge:

¶ 1 This case arises from a dispute regarding overhead charges under an oil and gas lease joint operating agreement (JOA) and its attached Council of Petroleum Accountants Societies (COPAS) accounting procedure.[1] The operator under the JOA, Defendant/Appellant Oneok Resources Company (Operator), seeks review of the trial court's judgment, based on a jury verdict, granting judgment against it both on the claim of the non-operating, participating working interest owners, Plaintiffs/Appellees (Owners) for declaratory relief and on Operator's counterclaim against Owners for breach of contract. Owners seek review of the trial court's order denying their application for attorney fees. We affirm the trial court's judgment but reverse the attorney fee order to the extent it found Operator's counterclaim was not an action to recover for services rendered and to the extent it awarded copying costs in excess of the statutory limit. We remand for determination of the amount of the fee award and redetermination of copying costs.

¶ 2 Operator acquired its interest in the JOA and the subject leases in 1997 from PSEC, Inc., formerly known as Potts–Stephenson Exploration Company (PSEC). PSEC's principals were Robert Stephenson, the lead plaintiff in this case, and Ray Potts. Both individually owned non-operating working interests in the wells. At the time Operator acquired PSEC's interests, Potts sold Operator his individually owned interest, while Stephenson retained his interest. The remaining Owners are Stephenson's friends and family.

¶ 3 The JOA and attached COPAS accounting procedure were based on standard industry model forms. The accounting procedure provided for the operator to charge an overhead rate "as compensation for administrative, supervision, office services and warehousing costs." The section on overhead also provided:

The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum

---

1. This case involves 76 oil and gas wells located in several Oklahoma counties. Operation of each well is governed by a 1956, 1977, or 1982 American Association of Petroleum Landmen (AAPL) 610 model form JOA, with a 1962, 1968, or 1974 COPAS model form accounting procedure attached as Exhibit C to each JOA. Because the relevant language in these JOAs is identical, we will treat them as being a single JOA.

and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

The JOA provided for a higher overhead rate while a well was being drilled and a lower one while a well was producing. It stated the overhead rates "may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive." The section of the JOA relating to the adjustment of bills provided,

[A]ll bills and statements rendered to Non–Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non–Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period....

¶ 4 According to the parties' stipulations, during the period when PSEC operated the wells, it voluntarily decided in certain years to forego annual upward adjustments of the producing overhead rates. The working interest owners paid PSEC's joint interest billings for those years without complaint as to the overhead rates.

¶ 5 Approximately three years after Operator took over operations, it internally audited the overhead rates it was charging for all wells it operated, and discovered PSEC had not escalated the overhead rates in prior years. Operator then took the initial rate and adjusted it forward by the applicable index factor for each year beginning from the effective date of the JOA. Once it had calculated the producing overhead rate it believed should have been charged, it went back two

years, to January 1998, and billed the recalculated rate for each well from 1998 forward.

¶ 6 Owners refused to pay the recalculated rate. They filed this action for declaratory judgment, seeking a determination Operator was not entitled to escalate overhead charges retroactively, but was required to multiply the rate in effect for the preceding year by the annual adjustment factor. Operator answered and counterclaimed for its recalculated overhead charge. The trial court denied both sides' motions for summary judgment and set the matter for jury trial.

¶ 7 Jury trial took place on May 7, 8, 9, 12, and 13, 2003. The jury returned a verdict in favor of Owners on their claim for declaratory relief and against Operator on its counterclaim. The trial court entered judgment based on the verdict, decreeing,

that the method utilized by [Operator] to adjust its producing overhead rates for the subject wells did not comply with the terms of the applicable joint operating agreements and that [Owners] have suffered damages and could suffer damages in the future as a direct result of [Operator's] breach of contract regarding past billings and the threat of future unauthorized billings.

. . .

... [Operator] shall only charge [Owners] indirect overhead rates based on the overhead rates in use and being billed at the time of [Operator's] 1997 acquisition of the subject wells, plus or minus the annual adjustment factor referenced in Article III of the COPAS Accounting Procedures.

¶ 8 As prevailing parties, Owners moved for attorney fees pursuant to 12 O.S. Supp. 2002 § 936, which authorizes fees in actions "[i]n any civil action to recover for labor or services rendered." Operator objected. After a hearing, the trial court entered an order finding (1) the hours and rates charged by Owners' attorneys were commensurate with the hours and rates charged for similar legal work in the relevant legal community, (2) the skill and expertise of Owners' attorneys was considerable, and was necessary to obtain the results garnered in this case, (3) the underlying case presented difficult issues

of first impression in Oklahoma, (4) the results obtained on Owners' behalf were exceptional and significant to the oil and gas industry as a whole, (5) the hourly rates for Owners' attorneys and the total number of hours expended were reasonable, (6) if Owners were entitled to an attorney fee award as prevailing party on Operators' counterclaim, it would award to Owners one-third of Owners' actual attorneys fees plus an incentive bonus equal to one-half of the fee awarded. However, the trial court ruled that Operator's counterclaim sought recovery of adjusted indirect overhead charges claimed due under the parties' JOA, and that such a claim was not one for the recovery of payments due for labor and services under a strict and narrow interpretation of § 936. It therefore denied Owners' application for attorney fees.

¶ 9 Operator appeals from the judgment against it and Owners counter-appeal from the order denying attorney fees.

I

¶ 10 Operator's first two contentions of error challenge the trial court's decision to give the case to jury. It argues it was entitled to a directed verdict because the relevant provisions of the COPAS accounting procedure are clear and unambiguous. It also argues Owners had no right to a jury trial on their claim for declaratory judgment.

¶ 11 In *Pitco Production Co. v. Chaparral Energy, Inc.*, 2003 OK 5, 63 P.3d 541, 545–546 (footnotes omitted), the Court recapitulated the rules for construing a JOA:

> The JOA is a contract to be construed like any other agreement. If language of a contract is clear and free of ambiguity the court is to interpret it as a matter of law, giving effect to the mutual intent of the parties at the time of contracting. Whether a contract is ambiguous and hence requires extrinsic evidence to clarify the doubt is a question of law for the courts.
>
> . . .
>
> . . . The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous. A contract is ambiguous if it is reasonably susceptible to at least two different con-

structions. To decide whether a contract is ambiguous we look to the language of the entire agreement.

■ ¶ 12 The failure of a JOA to expressly address a question may create an ambiguity requiring extrinsic evidence, such as industry custom and usage, to determine the intent of the parties. *Oxley v. General Atlantic Resources, Inc. (Oxley)*, 1997 OK 46, 936 P.2d 943, 946. When the meaning of an ambiguous contract is in dispute, evidence of extrinsic facts is admissible, and construction of the contract becomes a mixed question of law and fact and should be submitted to a jury under proper instructions. *Altshuler v. Malloy*, 1963 OK 243, 388 P.2d 1, 4. That the suit involves a petition for declaratory relief does not change the manner in which issues of fact are tried. 12 O.S.2001 § 1656.

¶ 13 Operator argues the language in the JOA stating well rates "shall" be adjusted each year did not allow the previous operator to forgo upward adjustments in prior years. Therefore, it contends, the "rate currently in use" meant the initial overhead rate as adjusted each April following the effective date of the JOA, not the overhead rate the operator is actually billing. Owners argue the language allowed for an annual adjustment on the first day of April of each year but did not prevent the operator from forgoing an adjustment in its favor. They contend the adjustment could only be made to the rate currently in use, meaning the rate in use just prior to the first day of April. They assert the JOA barred any adjustment favorable to the operator from occurring more than two years after a billing was presented and paid.

■ ¶ 14 As used in contracts, "shall" in its ordinary sense is imperative rather than permissive and imposes an enforceable obligation to discharge the subject duty. *Osprey L.L.C. v. Kelly–Moore Paint Co. Inc.*, 1999 OK 50, 984 P.2d 194, 199 n. 12. The overhead rate adjustment clause provides for either an upward adjustment of rates or a downward adjustment, depending upon whether the average weekly earnings of oil and gas workers increased or decreased during the last calendar year. An upward adjustment imposes a duty on the non-operating owners enforceable by the operator,

while a downward adjustment imposes a duty on the operator enforceable by the non-operating owners. The non-operating owners' duty in upward adjustment years is to pay an increased rate, while the operator's duty in downward adjustment years is to charge a decreased rate.

■ ¶ 15 The language of the JOA does not prevent the parties from forgoing their rights to enforce the other party's obligations. Therefore, we cannot say the contract requires the operator to enforce its right to an upward adjustment in each year it is entitled to one. The JOA does allow the parties to agree to a different rate. The contract does not address whether, in circumstances where yearly adjustments were not made, the "current" rate is based on the cumulative rate from the effective date of the agreement or on the rate actually being charged prior to that adjustment. Therefore, it is reasonably susceptible to at least two different constructions. As in *Oxley*, 936 P.2d at 946, this case involves an ambiguity in a standard form in use in the oil and gas industry. Extrinsic evidence of industry custom and usage is appropriate to resolve the ambiguity. *Id.* The trial court did not err in submitting the question to the jury.

## II

■ ¶ 16 Operator's next contention is the trial court did not properly instruct the jury. In reviewing jury instructions, we consider the accuracy of the statement of law, the applicability of the instructions to the issues when the instructions are considered as a whole, and whether the probability arose that jurors were misled and reached a different conclusion due to an error in the instruction. *Cimarron Feeders, Inc. v. Tri–County Elec. Coop., Inc.,* 1991 OK 104, 818 P.2d 901, 902.

¶ 17 Operator first argues the trial improperly instructed regarding standard industry forms by refusing Operator's proposed instruction[2] and by giving Jury Instruction No. 11[3] instead. Operator's proposed instruction is based on the Restatement (Second) of Contracts § 211(2) (1981). Operator states in its brief that it found no Oklahoma case directly addressing § 211 of the Restatement, but that *Oxley*, 936 P.2d at 943, is in accord in holding a JOA, as a standard industry form, should be interpreted in accordance with the custom and usage in the oil and gas industry. Operator argues the third paragraph of Instruction No. 11 directly contradicts § 211 by making the parties' understanding of the industry form conclusive and negating the significance of an interpretation of the language adopted by the industry association, COPAS, who drafted the language at issue.

■ ¶ 18 We agree *Oxley* states Oklahoma law as to the interpretation of standard industry forms. If there is an ambiguity in a standard industry form, the trier of fact may look to extrinsic evidence, such as industry custom and usage, to determine the intent of the parties. However, unlike in § 211, the

---

2. Operator's proposed instruction directed the jury to decide the meaning of the overhead adjustment clause. It quoted the clause and then stated:

Your [sic] are instructed that the model form Joint Operating Agreements and attached COPAS Accounting Procedures governing the Subject Wells are standardized forms that have been in use in the oil and gas industry for many years. As standardized industry forms, the Joint Operating Agreements and attached COPAS Accounting Procedures governing the Subject Wells are to be interpreted whenever reasonable as treating alike all those similarly situated, without regard to the parties' individual knowledge or understanding of the standard terms contained in the agreements. The purpose of interpreting standardized industry forms in this manner is to promote the uniform interpretation of agreements that are widely used in a particular industry, in this case the industry of oil and gas, without regard to the chance circumstance of the parties.

3. Jury Instruction No. 11 stated:

You should interpret the words of the contract in their ordinary and popular sense, unless you decide that the parties used them in some other sense.

If the parties used technical words, they should be interpreted in the way that they are usually understood by persons in the business in which they are used, unless clearly used in a different sense.

If the parties to the contract have dealt with each other before and their previous dealings showed that they had a common understanding as to the meaning of certain terms, then you should interpret those terms according to their commonly understood meaning.

intent of the parties still controls. Therefore, the COPAS interpretation, adopted years after the parties entered the JOA, is relevant evidence of industry custom and usage and may be considered by the jury, but does not override the intent of the parties. Operator's proposed instruction, to the extent it states standard industry forms should be interpreted to promote uniform interpretation without regard to the chance circumstance of the parties, is not a correct statement of Oklahoma law. The trial court did not err in refusing to give it.

¶ 19 The trial court correctly instructed the jury as to the *Oxley* rule by stating in Instruction No. 10 that the parties' overall intent controlled and by stating in Instruction No. 12 that custom and usage should be considered when interpreting a contract. The third paragraph of Instruction No. 11, instructing the jury to apply the parties' common understanding, as shown by the parties' previous dealings, of the meaning of certain terms, is taken from Oklahoma Uniform Jury Instructions—Civil (OUJI–CIV) No. 23–13. It is intended to cover the "special meaning ... given ... by usage" exception to the rule that words of a contract are to be understood in their ordinary sense, as provided by 15 O.S.2001 § 160. OUJI–CIV No. 23–13 Comments. It is a correct statement of Oklahoma law. The trial court did not err in giving Instruction No. 11.

¶ 20 Operator next argues the trial court erred in refusing its proposed instruction identifying the particular provisions that required the jury's interpretation. Instruction No. 2 adequately described the issues and set forth for the jury the question it was to decide. The trial court did not err in refusing Operator's proposed instruction. Operator also argues the trial court erred in refusing to instruct on the word "shall." The trial court's instruction on the meaning of words, taken from OUJI–CIV No. 23–13, correctly stated Oklahoma law on this issue. The trial court did not err in refusing Operator's modification of OUJI–CIV No. 23–13.

III

¶ 21 Operator's next contention of error is the trial court allowed improper expert testimony. It first argues PSEC's accountant, Roger Rose, was not an expert on COPAS accounting procedures, but Operator does not contend the trial court erred in allowing Rose's testimony. Therefore, we will not consider any error relating to the admission of Rose's testimony. Operator does contend the trial court erred in failing to qualify Owner's expert witness, Steven Agee, as a COPAS accounting expert.

¶ 22 On direct examination at trial, Agee testified he received a Ph.D. in economics in 1982. He said he then moved to Oklahoma to join his father-in-law in the oil business, and formed XAE Corporation. Agee said he attended short courses on geology, engineering, petroleum engineering, electric logging, and joint operating agreements. He testified he had twenty years of experience with JOAs for hundreds of wells, both as operator and non-operating working interest owner. At the time of trial, he operated about 105 wells. Agee said he currently served on the board of directors of the Oklahoma Independent Petroleum Association and the Oklahoma Energy Resources Board. He was also a member of the Industry Advisory Committee for the Oklahoma Corporation Commission.

¶ 23 After Agee testified to his qualifications, Operator asked to voir dire him before he was allowed to testify as an expert. The trial court refused, stating the evidence code allowed anyone to state their qualifications and opinions, leaving it for the jury to decide whether the person was an expert. Operator objected, arguing the Oklahoma Supreme Court had recently adopted *Daubert*[4] requiring a person to be qualified before testifying as an expert. The trial court allowed Agee to testify to his opinion, based on his training, experience, and industry practice, regarding the meaning of the language, "the rate currently in use" as used in the overhead rate adjustment clause. The trial court then allowed Operator to inquire into Agee's qualifications on cross-examination, during

---

**4.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469    (1993).

which Agee agreed he was not an oil and gas accountant or auditor, was not a member of COPAS, and his only formal training on CO-PAS was a short course early in his career.

¶ 24 In *Christian v. Gray*, 2003 OK 10, 65 P.3d 591, 594, the Oklahoma Supreme Court adopted the procedure set forth in *Daubert* and *Kumho Tire Co., Ltd. v. Patrick Carmichael et al.* (*Kumho*), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) as appropriate for determining the admissibility of expert testimony in civil proceedings in Oklahoma. Under those cases, the trial court must serve as gatekeeper for expert testimony by determining whether the testimony is relevant and has a reliable basis in the witness's knowledge and experience in the relevant discipline. *Kumho*, 526 U.S. at 149, 119 S.Ct. 1167. The proponent of the expert testimony need not prove it is correct, but must prove by a preponderance of the evidence that the testimony is reliable. *Christian v. Gray*, 65 P.3d at 603.

¶ 25 The standard of review for a *Daubert* ruling is abuse of discretion. *Id.* at 608. However, in this case, the trial court failed to make such a ruling but did allow the opponent of the expert testimony to put on its evidence controverting the witness's knowledge and experience during cross-examination. Therefore, we will review *de novo* the issue of law of whether the reliability of the expert testimony was established by a preponderance of the evidence.

■ ¶ 26 As we stated above, the issue of fact for the jury to decide was whether the parties intended the "current" rate to be adjusted to be based on the cumulative rate from the effective date of the JOA or on the rate actually being charged prior to that adjustment. In construing a standard industry form, the jury was entitled to consider industry custom and practice. The interpretation given the language by COPAS members is appropriate to show industry custom and practice, but is not the only such evidence. The interpretation given the language by experienced oil and gas operators is also relevant and reliable evidence of industry custom and practice. The preponderance of the evidence established Agee was an experienced oil and gas operator, as well as an

industry leader, although he did not have experience in COPAS accounting. His testimony was relevant and reliable evidence of the industry's custom and practice in interpreting the language of the overhead adjustment clause. The trial court did not err in admitting it.

## IV

■ ¶ 27 Operator's last contention is the trial court erred in allowing costs. It argues the trial court awarded costs for the copying of papers not used at trial and awarded costs in excess of the statutory rates. The meaning of "papers necessarily used at trial" as used in 12 O.S.2001 § 942(4) is not limited to the exhibits entered into evidence but includes copies of all exhibits, including those provided to opposing counsel and the court. We find no error in the number of copies for which the trial court allowed recovery, but we do find the trial court failed to apply the statutory rate for copies. The award of costs for copies must be reversed and remanded for determination in compliance with 12 O.S. 2001 § 942(4). The statutory rate for transcript copies set forth in 20 O.S. Supp.2002 § 106.4 applies only to transcripts made by the official reporter; therefore, we do not disturb the trial court's award of deposition costs.

## V

■ ¶ 28 In their counter-appeal, Owners contend they were entitled to recover their reasonable attorney fees under 12 O.S. Supp. 2002 § 936 and the fee should not be apportioned. Pursuant to § 936, the prevailing party is allowed attorney fees "[i]n any civil action to recover for labor or services." This statute applies in a breach of contract action only if the damages arose directly from the rendition of labor or services, such as a failure to pay for those services, but not if the damages arose from an aspect collaterally relating to labor and services, such as loss of profits on a contract involving the rendition of labor and services. *Burrows Const. Co. v. Independent School Dist. No. 2 of Stephens County*, 1985 OK 57, 704 P.2d 1136, 1138.

¶ 29 Here, Owners sued Operator for a declaratory judgment to determine the effect of language in the overhead adjustment clause. Operator countersued to collect the overhead charge it asserted was due. Pursuant to the parties' contract, the overhead charge was "compensation for administrative, supervision, office services and warehousing costs." Therefore, Operator's damages arose from Owners' failure to pay for those services and its suit was to recover payment for those services. The trial court erred in refusing to grant attorney fees pursuant to § 936 for Owners' defense of Operator's counterclaim. It did not err in requiring apportionment of Owners' attorney fees, however. Owners' action for declaratory relief related to a contract for services but was not an action to recover for services. Therefore, Owners are not entitled to attorney fees pursuant to § 936 for prosecuting their claim for declaratory relief.

¶ 30 The trial court's order on attorney fees and costs is REVERSED to the extent it found Operator's counterclaim was not an action to recover for services rendered and to the extent it awarded copying costs in excess of the statutory rate. This matter is REMANDED for determination of the amount of the attorney fee award and for redetermination of copying costs. The trial court's judgment is AFFIRMED in all other respects.

MITCHELL, P.J., concurs.

JOPLIN, J., dissenting:

I would reverse for failure of the trial court to follow *Christian v. Gray*, 2003 OK 10, 65 P.3d 591. However, I believe the trial court was correct in denying attorney's fees to Owners.