The Pantry, Inc. v. Citgo Petroleum Corp., 2009 NCBC 1.

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
                                      SUPERIOR COURT DIVISION

LEE COUNTY                                    08 CVS 00692

THE PANTRY, INC.,

           Plaintiff,

   v.

CITGO PETROLEUM CORP.,

           Defendant.

**ORDER & OPINION**

*Robinson, Bradshaw & Hinson, P.A. by D. Blaine Sanders, Lawrence C. Moore, III, and Blake N. Thomas for Plaintiff.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by James T. Williams, Jr., Jennifer K. Van Zant, and D.J. O'Brien, III; and Eimer Stahl Klevorn & Solberg LLP by Scott C. Solberg and Lisa S. Meyer for Defendant.*

Diaz, Judge.

    {1}    Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("the Motion").

    {2}    After considering the Complaint, the Motion, the briefs of the parties, and the arguments of counsel, the Court **GRANTS** the Motion.[1]

---

[1] In resolving the Motion, the Court considered the contract at issue in this case. *See Oberlin Capital, L.P. v. Slavin,* 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001) (stating that a trial court may properly consider a contract that is the subject of a plaintiff's complaint). Consistent with *Slavin,* however, the Court did not consider the EPA study referred to by Defendant in its brief, nor did it consider the five exhibits attached to Plaintiff's brief.

# I.

## PROCEDURAL BACKGROUND

{3}    On 13 June 2008, Plaintiff filed its Complaint in Lee County Superior Court.  Also on that date, Plaintiff filed a Notice of Designation designating the case as mandatory complex business.

{4}    On 15 August 2008, Defendant filed the Motion and supporting brief.

{5}    Plaintiff filed a response brief on 8 September 2008.

{6}    Defendant filed a reply brief on 22 September 2008.

{7}    The Court heard oral argument on the Motion on 29 October 2008.

# II.

## THE FACTS

{8}    Plaintiff The Pantry, Inc. ("The Pantry") is a Delaware corporation with its principal place of business in Sanford, North Carolina.  (Compl. ¶ 1.)

{9}    The Pantry owns a chain of independently operated convenience stores, which sell gasoline and other products.  (Compl. ¶ 4.)

{10}   Defendant CITGO Petroleum Corporation ("CITGO") is a Delaware corporation with its principal place of business in Houston, Texas.  (Compl. ¶ 2.)

{11}   In August 2000, the parties executed a Distributor Franchise Agreement (the "DFA"), governing CITGO's sale of motor fuel to The Pantry.  (Compl. ¶ 5; Def's. Mot. Dismiss, Ex. A.)

{12}   In 2002, The Pantry began soliciting bids from several major oil companies (including CITGO) for the supply of motor fuel in an effort to secure prices "that would allow The Pantry to sell motor fuel at prices competitive with other retailers in its markets."  (Compl. ¶ 6.)

{13}   In February 2003, The Pantry and CITGO signed an amended and restated Addendum to the DFA (the "Amended and Restated Addendum"), pursuant to which CITGO became The Pantry's largest supplier of motor fuel.  (Compl. ¶ 7; Def's. Mot. Dismiss, Ex. A, at 10.)

{14}   Since then, the parties have executed four amendments to the Amended and Restated Addendum.  (Def's. Mot. Dismiss, Ex. A.)  Hereafter, the Court will refer to the parties' final agreement as the "Final Amended DFA."

{15}   Pursuant to the Final Amended DFA, The Pantry pays CITGO a set price, denominated as CITGO's "net rack price," for all motor fuel purchases.  (Def's. Mot. Dismiss, Ex. A, at 11.)  If, however, The Pantry's motor fuel purchases exceed certain volume requirements, it is entitled to a downward price adjustment, calculated as the difference between CITGO's net rack price and "the sum of (i) the 'base price' plus (ii) an 'adder fee' plus applicable taxes."  (Compl. ¶ 11; Def's. Mot. Dismiss, Ex. A, at 11–12.)

{16}   Paragraph 4(i) of the Final Amended DFA specifies that the base price "shall equal the average of the two lowest net OPIS rack prices for the applicable grade of motor fuel at the applicable Terminal at the date of lifting."  (Compl. ¶ 8; Def's. Mot. Dismiss, Ex. A, at 11.)

{17}   "OPIS" refers to "Oil Price Information Service," which the parties agree is a market source for pricing of petroleum products.  (Compl. ¶ 8.)

{18}   The "net OPIS rack price" is defined under the Final Amended DFA as "the posted rack price minus any applicable discount."  (Compl. ¶ 8; Def's. Mot. Dismiss, Ex. A, at 11.)

{19}   More specifically, the net OPIS rack price refers to the two lowest posted prices offered by any seller in the given market.  Defendant's brief alleges, and Plaintiff does not dispute, that OPIS "issues daily price reports for each of the various types of motor fuel sold by each supplier at each gasoline distribution terminal nationwide."  (Def's. Mem. Supp. Mot. Dismiss 1.)

{20}   The term "applicable grade" in paragraph 4(i) of the Final Amended DFA refers to three standard octane grades of motor fuel:  regular unleaded, mid-grade, and premium.  (Compl. ¶ 8.)

{21}   The original DFA did not define the term "motor fuel."  Section 7.1 of the Final Amended DFA, however, which addresses minimum aggregate volume

performance criteria under the contract, defines "'Motor Fuels' . . . as all grades of gasoline, branded and unbranded, and diesel." (Def's. Mot. Dismiss, Ex. A, at 26.)

{22} In 2007, The Pantry's competitors began selling ethanol-blended gasoline ("E-10 gasoline") at a lower price than "clear" gasoline. (Compl. ¶ 13.)

{23} E-10 gasoline is a mixture of ninety (90) percent clear gasoline and ten (10) percent ethanol. (Compl. ¶ 13.)

{24} Both clear gasoline and E-10 gasoline are produced and distributed under one of the three standard octane grades. (Compl. ¶¶ 13–14.)

{25} The Final Amended DFA does not mention E-10 gasoline, and in 2007, CITGO was not supplying E-10 gasoline to The Pantry. (Def's. Mot. Dismiss, Ex. A; Compl. ¶ 13.)

{26} To remain competitive in its retail markets, The Pantry secured consent from CITGO to produce its own E-10 gasoline by mixing ethanol with "clear" gasoline[2] purchased pursuant to the Final Amended DFA "on the condition that The Pantry would be required to buy [E-10 gasoline] from CITGO when CITGO chose to make it available." (Compl. ¶ 13; Def's. Mot. Dismiss, Ex. A, at 32.)

{27} In April 2008, CITGO announced that it would begin supplying E-10 gasoline at all terminals at which The Pantry takes motor fuel under the Final Amended DFA and would no longer supply clear gasoline at those terminals. (Compl. ¶ 14.)

{28} The Pantry's competitors, on the other hand, remain able to purchase "clear" gasoline from other suppliers and to "splash-blend" E-10 gasoline. (Compl. ¶ 17.)

{29} Moreover, while CITGO agreed to pass on to The Pantry a 5.1-cents-per-gallon federal excise credit given to producers of ethanol blend fuels, it also raised the net rack price of its E-10 gasoline from four (4) to six (6) cents over its price for clear gasoline of the same grade. (Compl. ¶ 15.)

---

[2] The Complaint refers to this process as "splash-blending." (Compl. ¶ 13.)

{30}   The Pantry, however, does not allege that CITGO breached the Final Amended DFA by electing to supply The Pantry solely with E-10 gasoline or by increasing the net rack price for E-10 gasoline by two (2) cents.

{31}   In determining the "base price" used to fix the price adjustment due The Pantry for E-10 gasoline purchases pursuant to the Final Amended DFA, CITGO does not, as The Pantry urges, consider the average of the two lowest net OPIS rack prices for all motor fuels of the grade in question, regardless of its composition. Instead, CITGO considers only the average of the two lowest net OPIS rack prices for the applicable grade of E-10 gasoline actually purchased by The Pantry.  (Compl. ¶ 16.)

{32}   Although not stated expressly in the Complaint, it appears that OPIS rack prices for "clear" gasoline are lower than those posted for E-10 gasoline of the same grade.  Because of this price disparity, CITGO's interpretation of the Final Amended DFA results in a price adjustment that is less than The Pantry claims to be due.  (Compl. ¶¶ 20–21.)


### III.
### THE PARTIES' CONTENTIONS

{33}   The Pantry alleges that CITGO's methodology for calculating certain price adjustments related to E-10 gasoline sold to The Pantry under the Final Amended DFA constitutes a breach of the agreement.  (Compl. ¶¶ 20–21, 28.)

{34}   In its Complaint, The Pantry requests that the Court declare the rights of the parties under the agreement and that it be awarded damages for CITGO's alleged breach of contract.  (Compl. Prayer for Relief ¶¶ 1–2.)

{35}   CITGO responds that the plain language of the Final Amended DFA supports dismissal of the Complaint.  (Def's. Mem. Supp. Mot. Dismiss 8–9.)

{36}   More specifically, CITGO asserts that when The Pantry purchases E-10 gasoline pursuant to the Final Amended DFA, CITGO's pricing (and any adjustments thereto) must be "based on the market prices for the comparable

product *and* octane grade from other sellers in the same geographic market, as reported by OPIS." (Def's. Mem. Supp. Mot. Dismiss 7.)

{37} To support that interpretation, CITGO quotes from the relevant subsection of the Final Amended DFA, noting that the agreement (1) classifies the relevant purchase price paid by The Pantry for motor fuel by looking at "*the applicable motor fuel that [The Pantry] ratably purchases from CITGO*" (Def's. Mem. Supp. Mot. Dismiss 5 (*quoting* Def's. Mot. Dismiss, Ex. A., at 11, ¶ 4)), and (2) states that the E-10 "sold to [The] Pantry should be based on 'the average of the two lowest net OPIS rack prices for *the applicable grade of motor fuel* at the applicable Terminal at the date of lifting.'" (Def's. Mem. Supp. Mot. Dismiss 5 (*quoting* Def's Mot. Dismiss, Ex. A, at 11, ¶ 4(i)).)

{38} According to The Pantry, CITGO's interpretation of the Final Amended DFA is inconsistent with the "history and purpose of the market-related pricing provision," which The Pantry secured in order to remain competitive in its markets. (Pl's. Mem. Opp. Mot. Dismiss 12–13.)

{39} The Pantry thus proffers what it contends is a "straightforward and simple" (yet very different) interpretation of the Final Amended DFA. (Pl's. Mem. Opp. Mot. Dismiss 2.)

{40} The Pantry notes first that CITGO made a unilateral decision to substitute E-10 gasoline for "clear" gasoline at terminals that supply The Pantry. (Pl's. Mem. Opp. Mot. Dismiss 4.)

{41} As a result, The Pantry contends CITGO has effectively conceded that E-10 gasoline is "interchangeable with and a substitute for clear gasoline" for all purposes under the Amended DFA; otherwise CITGO would be in breach of its obligation to supply The Pantry with gasoline. (Pl's. Mem. Opp. Mot. Dismiss 7–8.)

{42} According to The Pantry, because the Final Amended DFA makes no reference to E-10 gasoline, and because CITGO unilaterally elected to substitute E-10 gasoline to meet its contract obligations, CITGO must look only to the applicable grade of the motor fuel in question when calculating the price adjustment due The Pantry under the Final Amended DFA. (Pl's. Mem. Opp. Mot. Dismiss 10–12.) Any

other interpretation of the Final Amended DFA, the Pantry contends, places it at a competitive disadvantage because some of its competitors remain able to purchase clear gasoline at a lower price and also "splash blend" E-10 gasoline. (Pl's. Mem. Opp. Mot. Dismiss 1, 12–13.)

{43} Consistent with this view, The Pantry asserts that CITGO must consider the OPIS net rack prices for clear gasoline in calculating the rebate due The Pantry for its purchases of E-10 gasoline under the Final Amended DFA, contending that the relevant "price is the average of the two lowest prices for motor fuel of the grade in question[,]" whatever the fuel's composition. (Pl's. Mem. Opp. Mot. Dismiss 2.)

IV.

PRINCIPLES OF LAW

A.

RULE 12(b)(6) MOTION TO DISMISS

{44} The essential question on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure is "'whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory.'" *Craven v. Cope*, ___ N.C. App. ___, ___, 656 S.E.2d 729, 731–32 (2008) (*quoting Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 480, 593 S.E.2d 595, 598 (2004)).

{45} To that end, "'[t]he complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief.'" *Id.* at ___, 656 S.E.2d at 731–32 (italicized in original) (*quoting Hunter*, 162 N.C. App. at 480, 593 S.E.2d at 598). Nevertheless,

> [d]ismissal under Rule 12(b)(6) is proper when one or more of the following three conditions is satisfied: (1) when on its face the complaint reveals no law supports plaintiff's claim; (2) when on its face the complaint reveals the absence of fact sufficient to make a good claim; and (3) when some fact disclosed in the complaint necessarily defeats plaintiff's claim.

*Johnson v. Bollinger*, 86 N.C. App. 1, 4, 356 S.E.2d 378, 380 (1987) (*citing Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985)).

## B.

## CONTRACT INTERPRETATION

{46}  The Amended DFA provides that Oklahoma law governs its interpretation, and the parties have stipulated to that choice of law.  As in North Carolina, Oklahoma courts consider "the provisions of a contract in their entirety, to give effect to the intention of the parties as ascertained from the four corners of the contract." *Okla. Oncology & Hematology P.C. v. US Oncology, Inc.*, 160 P.3d 936, 946 (Okla. 2007) (citation omitted).

{47}  If the language of a contract is clear and only one reasonable interpretation exists, the courts must enforce the contract as written.  *See Rush v. Champlin Ref. Co.*, 321 P.2d 697, 700 (Okla. 1958).

{48}  If the contract is ambiguous, however, "evidence of extrinsic facts is admissible, and construction of the contract becomes a mixed question of law and fact and should be submitted to a jury under proper instructions." *Stephenson v. Oneok Res. Co.*, 99 P.3d 717, 721 (Okla. Civ. App. 2004).  An ambiguity exists in a contract if the language of the contract is fairly and reasonably susceptible to either of the constructions asserted by the parties. *Id.*

## V.

## ANALYSIS

{49}  After careful review of the Final Amended DFA, the Court concludes that (1) it is not ambiguous, and (2) CITGO's interpretation of the contract language is the only reasonable one.

{50}  CITGO's reply brief neatly summarizes the dispute in this case:

> Does the "market related pricing" formula in the [Final Amended DFA] contemplate that CITGO sell E10 motor fuel to Pantry at a price based on the OPIS-reported market prices for E10?  Or does it require, as Pantry suggests, that CITGO sell E10 to Pantry at a price based on the OPIS-reported market prices for clear gasoline, even though OPIS

treats E10 and clear gasoline as different products by reporting separate market prices for each?

(Def's. Reply Mem. 1.)

{51} The parties' divergent views on these questions arise because the Final Amended DFA does not address whether CITGO may substitute E-10 gasoline to meet its supply obligations.

{52} Despite this omission, however, the Final Amended DFA does contemplate that the parties could buy and sell distinct motor fuel products. (Def's. Mot. Dismiss, Ex. A, at 10 (noting that The Pantry has received offers from other supplier to purchase motor fuels, which in turn served as the impetus for The Pantry's request that CITGO sell branded and unbranded gasoline, as well as low sulfur diesel, on a similar basis); *see also* Def's Mot. Dismiss, Ex. A, at 5 (establishing the ratio of fuel grades—regular unleaded, mid-grade, and premium—The Pantry is to purchase under the Final Amended DFA); Def's. Mot. Dismiss, Ex. A, at 26 (defining "Motor Fuels" as "all grades of gasoline, branded and unbranded, and diesel").)

{53} The Court also notes the absence of any claim by The Pantry that CITGO breached the Amended DFA when it elected to make available only E-10 gasoline for purchase by the Pantry.

{54} Thus, the Complaint and the four corners of the Final Amended DFA reveal the following: (1) by its silence, The Pantry implicitly concedes that CITGO acted within its rights under the Final Amended DFA to make available only E-10 gasoline; (2) the market pricing formula in the Final Amended DFA refers generally to the product sold by CITGO as "motor fuel," which fuels are then classified further by their applicable octane grade; (3) "clear" gasoline and E-10 gasoline are recognized by the external market chosen by the parties ("OPIS") as different products for pricing purposes; and (4) the parties agreed that OPIS prices would be used to calculate price adjustments under the Final Amended DFA.

{55} In light of this, the Court agrees with Defendant that the only reasonable interpretation of the "market related pricing" formula in the Final Amended DFA requires alignment of the precise motor fuel product purchased by The Pantry (whether clear gasoline or E-10 gasoline) with the benchmark market price for that fuel as determined by OPIS.

{56} In contrast, The Pantry's interpretation of the Final Amended DFA does violence to the contract terms by "mixing apples and oranges" as to the motor fuels offered by CITGO in an understandable, but insupportable, effort to obtain more favorable pricing terms.

{57} In its Complaint, The Pantry contends the market pricing provisions in the Final Amended DFA were negotiated to "secure a price to The Pantry that would allow The Pantry to sell motor fuel at prices competitive with other retailers in its markets." (Compl. ¶¶ 6–7.)

{58} Even accepting that claim as true, CITGO's interpretation of the Final Amended DFA is nevertheless perfectly consistent with that purpose because it requires CITGO to sell E-10 gasoline to The Pantry "based *on the two lowest posted prices* for E10 offered by *any seller in a given market*." (Def's. Reply Mem. 6.)

{59} Near the end of its brief, The Pantry candidly explains why it now finds itself at a competitive disadvantage under the Final Amended DFA: (1) CITGO has effectively negated any benefit to The Pantry from its "pass through" of the ethanol federal excise tax credit by increasing the price of its E-10 gasoline; and (2) The Pantry's competitors remain free to "splash blend" their own E-10 gasoline, thus reaping the full benefit of the tax credit. (Pl's. Mem. Opp. Mot. Dismiss 13.)

{60} As to these issues, however, The Pantry's remedy is not to contort the language of the "market pricing" provisions of the Final Amended DFA beyond their plain meaning but, instead, to renegotiate the contract terms or find an alternate supplier. *See, e.g.*, *Livesay v. Shoreline, LLC,* 31 P.3d 1067, 1071 (Okla. Civ. App. 2001) ("The law will not make a better contract than the parties themselves have seen fit to enter into, or alter it for the benefit of one party to the detriment of

another." (*citing King-Stevenson Gas & Oil Co. v. Texam Oil Corp.*, 466 P.2d 950, 954 (Okla. 1970))).

## VI.
## CONCLUSION

{61} For the reasons set forth above, the Court **GRANTS** Defendant's Motion to Dismiss the Complaint with prejudice.

This the 22nd day of January, 2009.