CLAUDE C. ARNOLD NON-OPERATED ROYALTY INTEREST PROPERTIES v. CABOT OIL & GAS CORP.



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:CLAUDE C. ARNOLD NON-OPERATED ROYALTY INTEREST PROPERTIES v. CABOT OIL & GAS CORP.

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 CLAUDE C. ARNOLD NON-OPERATED ROYALTY INTEREST PROPERTIES v. CABOT OIL & GAS CORP.
2021 OK 4
485 P.3d 817
Case Number: 115807
Decided: 01/26/2021
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2021 OK 4, 485 P.3d 817

 

CLAUDE C. ARNOLD NON-OPERATED ROYALTY INTEREST PROPERTIES, L.L.C.; WILLIAM V. YORK & GALEETA M. YORK REVOCABLE TRUST; GUNN LIVING TRUST DATED 12-17-91; and SHARON L. MARTIN, Plaintiffs/Appellees,
v.
CABOT OIL & GAS CORPORATION, Defendant/Appellant.

CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION 4;
ON APPEAL FROM THE DISTRICT COURT OF BEAVER COUNTY

HONORABLE JON PARSLEY, TRIAL JUDGE

¶0 Plaintiffs held an overriding royalty interest in oil and gas produced under mineral leases executed in 1973. In 2012, defendant began producing oil and gas from a new geologic formation on lands covered under those same leases. Plaintiffs sought payment of their share of royalty from the new production, defendant refused, and plaintiffs brought this lawsuit. Finding they continued to hold a valid overriding royalty interest under the 1973 leases, the district court granted judgment to the plaintiffs after a bench trial. The Court of Civil Appeals, however, reversed after determining that a statute of limitations barred plaintiffs' claims in full due to a purported cloud on their interest arising from subsequently recorded oil-and-gas leases. Because the later-recorded leases did not reasonably give plaintiffs notice of any interest adverse to their own, we hold that their cause of action did not accrue until defendant refused to pay royalties on the new production in 2012. Plaintiffs filed a timely lawsuit. On certiorari granted upon plaintiffs' petition,

THE COURT OF CIVIL APPEALS' OPINION IS VACATED; THE TRIAL 
COURT'S JUDGMENT IS AFFIRMED.

Thomas G. Wolfe, Catherine L. Campbell, and John M. Bunting, Phillips Murrah, P.C., Oklahoma City, Oklahoma, for Plaintiffs/Appellees.

Jesse R. Pierce, Pierce & O'Neill, LLP, Houston, Texas, Douglas D. Dale, Wright & Dale, Guymon, Oklahoma, Mark D. Christiansen, Edinger Leonard & Blakley PLLC, Oklahoma City, Oklahoma, and Michael F. Smith, McAfee & Taft, Tulsa, Oklahoma, for Defendant/Appellant.

Kraettli Q. Epperson, Maris A. Skinner, Mee Hoge PLLP, Oklahoma City, Oklahoma, Amicus Curiae.

GURICH, J.

¶1 This appeal asks us to decide whether the plaintiffs in this case waited too long in asserting their right to payment of an overriding royalty interest in an oil-and-gas-producing formation. In other words, does a statute of limitations defeat their claim for payment of oil-and-gas royalties? The Court of Civil Appeals reversed the trial court's judgment in favor of the plaintiffs on those grounds. We do not agree.

¶2 For reasons we explore below, this litigation could not have arisen until the defendant first developed the disputed formation--which proved productive and profitable--in 2012, and then refused the plaintiffs' request for payment of royalties from that production. Nothing preceding that sequence of events could reasonably have foreclosed the plaintiffs' ability to press their claim for the payments to which they were entitled under valid mineral leases. Accordingly, we hold that the plaintiffs filed a timely lawsuit to enforce their valid overriding royalty interest.

Facts and Procedural History

¶3 The dispute in this case centers around two oil-and-gas-producing formations--known as the Chester and the Marmaton--located in Beaver County, Oklahoma.[1] In 1973, a company called Arnold Petroleum, Inc.--the predecessor in interest of the plaintiffs, whom we collectively refer to as Arnold--obtained six oil-and-gas leases covering land in Beaver County. Each of these 1973 leases was filed in the county land records. The leases had a primary term of three years, plus a five-year extension period.

¶4 In all of the leases, however, the provisions on lease expiration were modified by the following clause, which has often been described in this litigation as unusual and is termed by the parties as the exception clause. It says: "provided, however, that Lessee shall not be obligated to release any formation, horizon or zone, the production from which would conflict with any existing producing horizon, formation or zone." The leases also allowed the lessee to surrender the leases "as to any part or parts of the leased premises by delivering or mailing a release thereof to lessor, or by placing a release of record in the proper County."

¶5 Over the course of 1973 and 1974, Arnold Petroleum assigned its leases to Dyco Petroleum Corporation, expressly reserving an overriding royalty interest in any oil and gas produced under the leases.[2] Dyco then assigned the leases to Harold Courson--the predecessor in interest of the defendant, Cabot Oil & Gas Corporation. This assignment, too, was expressly subject to Arnold's overriding royalty interest. Before the end of the leases' primary term, Courson drilled and completed two vertical wells in the Chester formation, which underlies the lands covered by the 1973 leases. Importantly--and indisputably--the two wells drilled in the Chester formation have produced "mostly gas with some oil" continuously since the mid-1970s, and at no point since then has Arnold ever stopped receiving payments on its overriding royalty interest in those producing wells.

¶6 The 1973 leases' primary term ended in 1976, and their additional five-year extended term as to open formations expired in 1981. In 1984, Courson obtained several new leases from the mineral owners who had granted the 1973 leases. These 1984 leases purported to cover the same rights as the original 1973 leases, but were silent as to any particular geologic formation or zone. The 1984 leases were recorded in the county land records, but Arnold was not told about them. Arnold did not become aware of the 1984 leases at all until 1999. In that year, Arnold and other royalty holders received a letter from Courson explaining he had recompleted a well in the Chester formation that had originally been drilled into the separate Lower Chester formation by another company, Natural Gas Anadarko, Inc. (NGA). NGA derived its interest in the Lower Chester formation from the 1984 leases. Having learned that Courson's recompleted well would now be producing from the Chester (where Arnold retained an overriding royalty interest), Arnold's landman contacted a Courson representative for further explanation. In the 1999 conversation, the Courson employee told the Arnold landman that the 1984 leases covered only the "deep rights" or "lower depths" that had expired under the 1973 leases. This assertion would exclude the Marmaton, which is a shallow formation. For the next 13 years, the matter of the Marmaton formation would remain dormant.

¶7 Courson assigned his leases to Cabot in August 2011, and Cabot soon set about drilling and completing two horizontal wells (to be followed later by a third well) in the Chester's neighboring formation, the Marmaton.[3] Cabot's initial two horizontal wells began producing in the first half of 2012.[4] In July 2012, Arnold contacted Cabot to request payment, taking the position that its rights in the Marmaton formation were held by virtue of the 1973 leases' exception clause. Arnold maintained that the Marmaton had always been capable of producing oil and gas in commercial quantities, but was prevented from doing so by a conflict caused by simultaneous (and continuous) production from the 1970s-era vertical wells drilled in the Chester.[5] Because the exception clause allowed such a formation to be held by the conflicting production in a different zone, then (in Arnold's view) the 1973 leases preserved its interest in the Marmaton.[6]

 

¶8 Cabot rejected Arnold's request for payment, and Arnold sued in October 2012. Arnold sought damages against Cabot for nonpayment of royalties and asked the district court to quiet title to the overriding royalty interest as to the Marmaton. Cabot, in turn, argued Arnold's claims were barred because the applicable statute of limitations began to run with the filing of the new leases in 1984, which event (in Cabot's view) should have put Arnold on notice of an adverse claim to the Marmaton. After a four-day bench trial, the district court--having found that Arnold's cause of action accrued on July 20, 2012, the date Arnold's representative contacted Cabot to request payment of the override--granted judgment in favor of Arnold.[7] The district court quieted title to the overriding royalty interest in Arnold and awarded $769,000 in actual damages and $493,000 in prejudgment interest, plus postjudgment interest, attorney fees, and costs.

 

¶9 Cabot appealed. Agreeing with Cabot that Arnold's claim accrued in 1984 upon the filing of the new leases in the county land records, the Court of Civil Appeals reversed the trial court's judgment on the grounds that 12 O.S. 2011 § 93(4)'s 15-year statute of limitations barred Arnold's claims as untimely.[8] According to the Court of Civil Appeals, Arnold would have needed to sue no later than 1999 to avoid the 15-year statute of limitations and to keep its Marmaton rights. We granted certiorari to examine the application of the statute of limitations based on purported notice of a recorded lease, where the parties' lengthy course of business conduct indicated neither awareness nor acknowledgement of the lease's effect on the oil-and-gas formation at issue.

Standard of Review

¶10 This matter comes to us as an appeal from a judgment rendered following a bench trial in a quiet-title action, which "may be used as an equitable proceeding to determine ownership of oil and gas lease or mineral rights." Voiles v. Santa Fe Minerals, Inc., 1996 OK 13, ¶ 35, 911 P.2d 1205, 1213. In this case, "[t]he judgment presented for review is a compilation of both findings of facts and conclusions of law." K & H Well Serv., Inc. v. Tcina, Inc., 2002 OK 62, ¶ 9, 51 P.3d 1219, 1223. "When, as here, the case is tried to the court, its determination of facts [is] accorded the same force as those made by a well-instructed jury." Id. Our caselaw instructs that where "any competent evidence supports the trial court's findings of fact, the same will be affirmed." Id.

¶11 At the same time, we review issues of law de novo, "since an appellate court has plenary, independent and non-deferential authority to reexamine a trial court's legal rulings." Id. Here, the Court of Civil Appeals treated the statute-of-limitations issue as dispositive and reversed the trial court's judgment on that basis alone. "Although limitation issues may involve mixed questions of law and fact, they are ordinarily reviewed in this Court as questions of law." Scott v. Peters, 2016 OK 108, ¶ 19, 388 P.3d 699, 704; Calvert v. Swinford, 2016 OK 100, ¶ 19, 382 P.3d 1028, 1036 (same). Likewise, "the application of the discovery rule and its effect on limitation issues present questions of law" that receive de novo review. Woods v. Prestwick House, Inc., 2011 OK 9, ¶ 14, 247 P.3d 1183, 1188.

Analysis

¶12 This case boils down to one main question: when did Arnold's cause of action arise? Put simply, "[a] cause of action accrues when the injury occurs." Calvert, 2016 OK 100, ¶ 11, 382 P.3d at 1033. That is, "the cause of action accrues when a litigant first could have maintained his action to a successful conclusion." MBA Commercial Constr., Inc. v. Roy J. Hannaford Co., 1991 OK 87, ¶ 13, 818 P.2d 469, 473; see also Horton v. Hamilton, 2015 OK 6, ¶ 9, 345 P.3d 357, 360 ("The accrual date . . . can only be present when each element of the cause of action has materialized."); 12 O.S. 2011 § 92 ("Civil actions can only be commenced . . . after the cause of action shall have accrued . . . ."). So, when was Arnold "injured," such that it could successfully sue to establish its rights in the Marmaton formation? We conclude that no injury occurred to Arnold before July 2012, when it first requested payment of its overriding royalty interest.

¶13 Cabot contends that--once the 1984 leases were filed in the Beaver County land records--two things supposedly happened right away: (1) Arnold was put on notice about an adverse interest that jeopardized the ongoing validity of its overriding royalty interest; and (2) the clock began to run on any potential cause of action to quiet title to that interest, based on 12 O.S. 2011 § 93(4)'s 15-year statute of limitations. Endorsing that reasoning, the Court of Civil Appeals reversed the district court. We think, however, that the district court reached the correct result: the existence of the subsequent 1984 leases--notwithstanding the fact of their recording--did not reasonably cast doubt on the viability of Arnold's interest in the as-yet-undeveloped Marmaton formation. The extent of that interest (and any adverse claims thereto) would not be put at issue until 2012, when horizontal drilling began and the Marmaton finally began to prove profitable for all parties concerned. No cause of action accrued until Arnold asserted its right to payment under the still-operative 1973 leases in 2012, and Cabot refused to pay.

¶14 The evidence at trial established that (1) simultaneous vertical-well production from the Marmaton would have conflicted with existing development in the Chester alone, thereby permitting both formations to be held by production in the Chester under the plain language of the leases' exception clause, (2) the Chester formation has produced continuously since drilling began in the mid-1970s, (3) Arnold has never stopped receiving its overriding royalty on that production, and (4) neither Cabot nor Courson ever surrendered or otherwise released their interests in the specific manner required by the 1973 leases. The filing of the 1984 leases did not alter those facts. As earlier stated by this Court: "it is difficult to see wherein the [subsequent] recording of defendant's mineral deed . . . could have any effect on plaintiff's rights or constitute notice to plaintiff of such deed." Straub v. Swaim, 1956 OK 97, ¶ 9, 296 P.2d 147, 149 (rejecting argument of defendant that plaintiff had constructive notice of a later-filed adverse mineral deed after the passage of 25 years, because--as in this case--plaintiff "was not a subsequent purchaser and such recording therefore afforded no notice to him"); see also Cunnius v. Fields, 1969 OK 8, ¶ 14, 449 P.2d 703, 707 ("The statute of limitations does not begin to run in the case of unexplored minerals until the legal effect of the reservation is questioned or disputed.").

¶15 That sets this case apart from the situation discussed in our more recent decisions in Scott v. Peters, 2016 OK 108, 388 P.3d 699, and Calvert v. Swinford, 2016 OK 100, 382 P.3d 1028. In those cases, the plaintiffs attempting to avoid the effect of the statute of limitations were the grantors of the mineral deeds in question. There, we held the statute-of-limitations period began to run when the deeds were filed with the county clerk. It is completely reasonable to expect that the grantor who negotiates, reads, and signs the instrument should be "on notice" of what it says from the time of filing onward. Scott, 2016 OK 108, ¶ 19, 388 P.3d at 704; see also Calvert, 2016 OK 100, ¶ 19, 382 P.3d at 1036.

¶16 But here, Arnold had no role in drafting or recording the 1984 leases, which were entirely silent about the Marmaton formation. This compels us to wonder what injury--or what "cloud"--the plaintiffs should have reasonably been expected to uncover in 1984, in 1999, or at the start of 2012. Nothing in the 1984 leases suggested the parties (who are unquestionably sophisticated about the oil-and-gas business) considered the 1973 leases terminated as to the Marmaton; nothing in the 1984 leases said anything about the Marmaton at all. The parties' business relationship continued as before, with Arnold receiving uninterrupted royalty payments from the Chester production. When Arnold spoke to Courson in 1999 about the 1984 leases, the Marmaton never came up because the status of that formation was not at issue. The fact that wells were drilled under the 1984 leases to the Lower Chester--a formation that no party has ever argued was held by production under the 1973 leases' exception clause--could not, by itself, tell Arnold anything about its Marmaton interest. From 1984 to 2012, nothing could reasonably alert even a sophisticated party like Arnold about an adverse claim to its Marmaton interest. We decline to impose a notice requirement on a party some three decades before that party, in fact, has anything whatsoever to sue over.[9]

 

¶17 An oil-and-gas lease "is a contract to be construed like any other agreement." Pitco Prod. Co. v. Chaparral Energy, Inc., 2003 OK 5, ¶ 12, 63 P.3d 541, 545. We must give effect to the bargained-for "exception clause" in the 1973 leases. Under its plain terms, a nonproducing zone capable of producing hydrocarbons in commercial quantities--here, the Marmaton formation--but unable to do so because of a conflict with existing production in another zone--here, the Chester formation--would nevertheless remain held by production in that latter zone for the duration of the lease. Before it began horizontal drilling in the Marmaton, Cabot had acquired title opinions cautioning: "This [1973] lease contains numerous unusual provisions. You should obtain a copy of this lease, review it, and ensure compliance with all of its terms, conditions and requirements." At trial, the district court found that Cabot "entirely ignored" the title opinion's warning until after it began drilling operations in the Marmaton. We emphasize that "we cannot give a defendant the benefit of some other contract he in hindsight might wish he had made. We can only interpret the plain language of the contract now before us." Bank of Okla., N.A. v. Red Arrow Marina Sales & Serv., Inc., 2009 OK 77, ¶ 40, 224 P.3d 685, 700.

 

¶18 In any event, the 1984 leases could not have unilaterally surrendered or else rewritten the 1973 leases in their entirety. Collins v. Chappell, 1958 OK 302, ¶ 12, 333 P.2d 578, 582 ("To be effectual, however, such act or acts [of surrendering a previous lease] must be inconsistent with the continuance of such former estate or interest, and must, moreover, be actually accepted and acted upon by the other, and, in fact, all the parties concerned.") (quotation omitted) (emphasis in Collins). One would be hard-pressed to think of anything more consistent with continuing the 1973 leases than paying royalties to Arnold for nearly forty years on production from the Chester formation.

¶19 The trial judge pointedly and succinctly identified the ultimate problem with Cabot's theory of the case when it asked Cabot's counsel at trial: "Why do you today get to decide which part was released and which part wasn't[?] . . . Why do you get to decide which part was or wasn't if it wasn't expressed?" The answer, of course, is that Cabot does not get to decide that question in a way that goes against the plain words of the 1973 leases and the parties' decades-long course of conduct. Arnold should have been secure in its good-faith belief that the terms of the 1973 leases continued to control its interest as to both formations until the actual injury to its interest in the Marmaton occurred in 2012. We hold that Arnold brought a timely lawsuit in 2012 to enforce its valid overriding royalty interest in the Marmaton formation under the oil-and-gas leases executed in 1973.

Conclusion

¶20 Words matter, and so does conduct. The words of the 1973 leases allowed the Marmaton formation to be held by the neighboring Chester formation's conflicting and continuous production. The conduct of the parties (and their predecessors in interest) showed a consistent intent--for almost forty years--to keep paying an overriding royalty to Arnold under the same 1973 leases. The recording of the 1984 leases did not change that. Nothing in law or equity supports requiring a plaintiff, in effect, to sue no later than 1999 for an injury that would not happen until 2012. Arnold filed a timely lawsuit to vindicate a valid interest. The judgment of the district court is affirmed in all respects.

THE COURT OF CIVIL APPEALS' OPINION IS VACATED; THE TRIAL 
COURT'S JUDGMENT IS AFFIRMED.

Kauger, Edmondson, Colbert, Combs and Gurich, JJ.; Bass, S.J., concur;

Darby, C.J., concurs in result;

Winchester, J., dissents;

Kane, V.C.J., not participating.

FOOTNOTES

[1] The Marmaton formation is a distinct geologic zone situated above--or, in the parlance of the oil-and-gas industry, "uphole" from--the Chester formation. The record indicates that the Chester formation sits about 7,300 feet underground, while the Marmaton begins at around the 6,200-foot mark.

[2] An overriding royalty, "as generally understood and accepted within the industry, is a percentage carved out of the lessee's working interest, free and clear of any expense incident to production and sale of oil and gas produced from the leasehold." De Mik v. Cargill, 1971 OK 61, ¶ 7, 485 P.2d 229, 232.

[3] Vertical and horizontal oil-and-gas wells differ in how they are drilled, and in how they function. "Horizontal wells represent a relatively recent technological advance in the oil and gas industry." Cont'l Res., Inc. v. Farrar Oil Co., 559 N.W.2d 841, 843 n.1 (N.D. 1997). "[V]ertical wells . . . effectively drain[] a surrounding area exhibiting high natural porosity and permeability." Murphy Expl. & Prod. Co.--USA v. Adams, 560 S.W.3d 105, 110 (Tex. 2018) (quotation omitted). On the other hand, "horizontal drilling in conjunction with hydraulic fracturing allows developers to profitably extract oil and gas directly from the less permeable source rock." Id. at 111; see also 52 O.S. Supp. 2017 § 87.6(B)(6) (defining horizontal well).

[4] Cabot's first two horizontal wells began producing from the Marmaton on February 29 and June 12, 2012, respectively.

[5] Briefly stated, the "conflict" contemplated under the exception clause would arise if a producing well in one formation prevented simultaneous production in a nearby zone. The evidence at trial showed that the 1970s-era vertical drilling in the Chester created such a conflict with the Marmaton. The trial court identified three separate conflicts--described as ownership, reservoir, and mechanical conflicts--each of which had foreclosed concurrent development in the Marmaton.

[6] As previously noted, the 1973 leases also permitted the lessee to surrender the leases "as to any part or parts of the leased premises by delivering or mailing a release thereof to lessor, or by placing a release of record in the proper County." Assuming some intention on their part to release the Marmaton before 2012, it is undisputed that Courson and Cabot never took any step to do so, notwithstanding the straightforward surrender provision of the 1973 leases.

[7] This case has involved exhaustive litigation for much of the past decade. The parties introduced hundreds of exhibits at trial, and the trial transcript itself spans 700 pages. The trial court's findings of fact and conclusions of law encompass 82 single-spaced paragraphs. We commend the capable efforts of counsel on both sides of this dispute.

[8] "Actions for the recovery of real property, or for the determination of any adverse right or interest therein, can only be brought within the periods hereinafter prescribed, after the cause of action shall have accrued, and at no other time thereafter: . . . . An action for the recovery of real property not hereinbefore provided for, within fifteen (15) years." 12 O.S. 2011 § 93(4).

[9] Even had the claim accrued in 1984, the discovery rule would have tolled the time for bringing this action. See Calvert, 2016 OK 100, ¶ 11, 382 P.3d at 1033 ("Oklahoma also follows the discovery rule allowing limitations . . . to be tolled until the injured party knows or, in the exercise of reasonable diligence, should have known of the injury."). Arnold alleged that, when it inquired about the scope of the 1984 leases in 1999, Courson's employee said that the 1984 leases covered only the "deep rights" or "lower depths"--in other words, not the shallower Chester or Marmaton formations. That representation would not prompt the need for further inquiry by Arnold because the statement aligns with how the parties had been operating under the 1973 leases all along.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1991 OK 87, 818 P.2d 469, 62 OBJ 2744, MBA Commercial Const., Inc. v. Roy J. Hannaford Co., Inc.
Discussed
 1956 OK 97, 296 P.2d 147, STRAUB v. SWAIM
Discussed
 1958 OK 302, 333 P.2d 578, COLLINS v. CHAPPELL
Discussed
 2002 OK 62, 51 P.3d 1219, K & H WELL SERVICE, INC. v. TCINA, INC.
Discussed
 1969 OK 8, 449 P.2d 703, CUNNIUS v. FIELDS
Discussed
 1971 OK 61, 485 P.2d 229, DE MIK v. CARGILL
Discussed
 2003 OK 5, 63 P.3d 541, PITCO PRODUCTION COMPANY v. CHAPARRAL ENERGY, INC.
Discussed
 1996 OK 13, 911 P.2d 1205, 67 OBJ 529, Voiles v. Santa Fe Minerals, Inc.
Discussed
 2009 OK 77, 224 P.3d 685, BANK OF OKLAHOMA v. RED ARROW MARINA SALES & SERVICE
Discussed
 2011 OK 9, 247 P.3d 1183, WOODS v. PRESTWICK HOUSE, INC.
Discussed
 2015 OK 6, 345 P.3d 357, HORTON v. HAMILTON
Discussed
 2016 OK 100, 382 P.3d 1028, CALVERT v. SWINFORD
Discussed at Length
 2016 OK 108, 388 P.3d 699, SCOTT v. PETERS
Discussed at Length
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 92, Commencement of Civil Actions
Cited
 12 O.S. 93, Limitation of Real Actions
Discussed at Length
Title 52. Oil and Gas
 Cite
Name
Level

 52 O.S. 87.6, Short Title - Definitions
Cited


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA